Johnnie W. LAY, Appellant–
Respondent,

v.

P & G HEALTH CARE, INC.,
et al., Plaintiff;

Schindler Elevator Corporation,
Respondent–Appellant.

No. WD 57678.

Missouri Court of Appeals,
Western District.

Dec. 12, 2000.

Motion to Transfer to Supreme Court
Denied Jan. 30, 2001.

Application for Transfer Denied
March 20, 2001.

Randall L. Rhodes, Kansas City, for appellant.

Thomas L. Caradonna, St. Louis, for respondent.

Before LOWENSTEIN, P.J., LAURA DENVIR STITH and NEWTON, JJ.

NEWTON, Judge.

## I. Factual and Procedural Background

### A. The Accident

Mr. Johnnie Lay had been employed as an elevator repairman since 1981, and he primarily installed, serviced, and repaired elevators and dumbwaiters.[1] On September 30, 1992, Mr. Lay was repairing a dumbwaiter car lodged between two floors at the Hyde Park Nursing Home in Kansas City, Missouri. The nursing home was a three-story structure, and the dumbwaiter was lodged about midway in the shaft. In an attempt to repair the dumbwaiter, Mr. Lay opened the small access panel[2] where he discovered that all of the cable had unwound from the drum.

The cable needed to be rewound around the drum because it was tangled around all of the equipment in the pit. But Mr. Lay could not reach all of the loose cable in the pit because the cable was wrapped around, under, and behind the various mechanical components on the backside of the pit. The pit had very limited access, and Mr. Lay did not have sufficient clearance to

---

1. A dumbwaiter car is a device that mechanically carries products, in this case, food, between floors. The dumbwaiter works by moving up and down mechanically by a motor in the bottom of the dumbwaiter shaft. The motor turns a drum, which is wound around a cable that extends up to the top of the dumbwaiter shaft, over a sheave or pulley, down to the top of the shaft, where the cable is anchored. When the drum is turned so as to spool cable out, the dumbwaiter car is lowered and conversely, when the cable is wound up on the drum, the car rises.

2. The access panel is located at the bottom of the dumbwaiter pit, below the lowest hoistway or service door.

reach into the pit to untangle the cable. Instead, Mr. Lay opened the basement service or hoistway door[3] to the shaft.

After untangling the cable, Mr. Lay and his assistant began rewinding the cable on the drum when the loaded dumbwaiter fell eight to ten feet to the bottom of the shaft. The car struck Mr. Lay, and his head was impaled on the equipment in the dumbwaiter pit. His injuries were extensive. The lower half of Mr. Lay's face, including his nose, left eye and jaw, was sheared off and left hanging by skin. Mr. Lay was conscious from the time the accident occurred until he was given anesthetic, which was over an hour after arriving at the hospital. In order to breathe and to control the bleeding, Mr. Lay held his face up against his skull while the doctors worked on him.

Following the accident, Mr. Lay was forced to undergo extensive reconstructive surgery on his face, and subsequently, underwent eight additional surgeries. His face remains disfigured and scarred. He has lost his left eyeball and suffers from palsy on the left side of his face. He has lost his depth perception and most of his ability to hear, smell, and taste. He also sustained damages to his inner ear and suffers from bouts of vertigo. In addition, he suffers from chronic headaches and the left side of his face and lips are completely numb, causing him to drool constantly. Finally, Mr. Lay suffers from recurrent, chronic infections in his face that require him to take antibiotics daily for the rest of his life. When the infections flare up, Mr. Lay must be hospitalized and receive heavy doses of IV antibiotics for days and sometimes weeks. As a result, Mr. Lay is unable to maintain employment.

## B. The Dumbwaiter

The Goetz–Niemer Company (Goetz) owned the nursing home where the accident occurred. In 1964 it contacted Allied Elevator Company (Allied) to replace a hand-operated dumbwaiter it had previously used with a mechanical one. Allied purchased the mechanical dumbwaiter from Atlas Elevator Company (Atlas), the manufacturer of the dumbwaiter, and then Allied resold it to Goetz. Allied installed the dumbwaiter in 1964. In 1981, Schindler Elevator Corporation (Schindler) purchased Allied and all of its stock. Allied merged into Schindler, and Schindler agreed to assume all of Allied's liabilities and obligations.[4] Schindler does not dispute that it is responsible as a successor corporation for Allied's liability.

## C. Procedural Background

On March 10, 1995, Mr. Lay filed suit against Atlas, the dumbwaiter manufacturer, and P & G Health Care, Inc., the owner of the nursing home at the time the lawsuit was filed. Mr. Lay amended his petition and added Schindler as another defendant. Subsequently, Mr. Lay settled his claims with Atlas and P & G Health Care, Inc. Schindler moved to dismiss Mr. Lay's claims against it, asserting that § 516.097[5] barred his claims. The trial court denied Schindler's motion and the case went to trial on May 3, 1999, before the Honorable Donald L. Mason in Jackson County Circuit Court.

Prior to trial, Mr. Lay dismissed his negligence and punitive damages claims against Schindler, but maintained his § 402A strict liability claims for transferring a defective product in the stream of commerce and for failure to warn. Mr. Lay claimed that the dumbwaiter was defective because it lacked a buffer assembly,

---

**3.** The hoistway door is the door through which the dumbwaiter car would normally be loaded and unloaded.

**4.** For clarity, any reference to Allied throughout this opinion also refers to Schindler and vice versa since all parties agree that Schin-

dler assumed all responsibility for Allied's liabilities upon its purchase.

**5.** All statutory references are to RSMo (1994), unless otherwise indicated.

it lacked a safe and adequate means of access, and it failed to give adequate warnings cautioning repairmen that the dumbwaiter lacked the proper safety equipment. At the close of Mr. Lay's evidence, Schindler filed a motion for directed verdict based on § 516.097. The trial court denied the motion. Again, at the close the evidence, Schindler filed a motion for directed verdict based on its affirmative defense. Mr. Lay also filed a motion for directed verdict; both motions were denied.

Section 516.097 is a statute of repose designed to protect architects, engineers, and builders against tort liability for defective improvements to real property. It requires that all tort actions be brought within a ten-year period upon completion of the improvement with limited exceptions including concealment of the defect. The statute reads as follows:

1. Any action to recover damages for personal injury, property damage or wrongful death arising out of a defective or unsafe condition of any improvement to real property, including any action for contribution or indemnity for damages sustained on account of the defect or unsafe condition, shall be commenced within ten years of the date on which any such improvement is completed.

2. This section shall only apply to actions against any person whose sole connection with the improvement is performing or furnishing, in whole or in part, the design, planning or construction, including architectural, engineering or construction services, of the improvement.

3. If any action is commenced against any person specified by subsection 2, any such person may, within one year of the date of the filing of such an action, notwithstanding the provisions of subsection 1, commence an action or a third party action for contribution or indemnity for damages sustained or claimed in any action because of personal injury, property damage or wrongful death arising out of a defective or unsafe condition of any improvement to real property.

4. This section shall not apply if:

(1) An action is barred by another provision of law;

(2) A person conceals any defect or deficiency in the design, planning or construction, including architectural, engineering or construction services, in an improvement for real property, if the defect or deficiency so concealed directly results in the defective or unsafe condition for which the action is brought;

(3) The action is brought against any owner or possessor of real estate or improvements thereon.

5. The statute of limitation for buildings completed on August 13, 1976, shall begin to run on August 13, 1976, and shall be for the time specified herein.

Schindler contends that it raised comparative fault as an affirmative defense in its answer to Mr. Lay's First Amended Petition. Mr. Lay filed a pretrial motion *in limine* to exclude all evidence of comparative fault because Schindler did not plead comparative fault with sufficient supporting facts and references to § 537.765.2. The trial court took the motion under advisement, but after Mr. Lay objected to testimony during trial arguing that it was outside of the pleadings, the trial court ruled that Schindler had failed to properly plead comparative fault as an affirmative defense. Schindler requested leave to file an amended answer to conform to the evidence. The trial court denied Schindler's request to amend due to the prejudicial impact a continuance would cause to Mr. Lay. The trial court ruled that Schindler had ample time to request leave to amend prior to trial and was aware that Mr. Lay objected to the defense because Schindler did not properly plead it.

At the close of the trial, the trial court believed the "door had been opened" on

comparative fault, but denied Schindler's request to reopen the evidence to allow testimony on the comparative fault issue. The trial court allowed Schindler to submit jury instructions on comparative fault. The jury allocated one-third fault to Mr. Lay and two-thirds fault to Schindler.

The jury returned a verdict in favor of Mr. Lay and awarded him $15 million. The jury allocated one-third of the fault to Mr. Lay, reducing the award for damages to $9,252,500. Schindler then filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for new trial. The trial court sustained Schindler's motion for JNOV based on the application of § 516.097, but denied the other post-trial motions. Mr. Lay appeals from the judgment, and Schindler cross-appeals the denial of its alternative post-trial motions.

Mr. Lay raises three points on appeal. The first point asserts that the trial court erred in granting Schindler's JNOV motion on the basis of § 516.097, because Schindler waived or abandoned it as an affirmative defense in that Schindler failed to offer or request jury instructions regarding that defense. In Mr. Lay's second point, he contends that the trial court erred in granting Schindler's JNOV motion because under § 516.097, Schindler's sole connection to the dumbwaiter was not limited to the types of services contemplated by the statute because Schindler sold or transferred the dumbwaiter in the stream of commerce and also serviced and modified the dumbwaiter a year after it was installed. Further, Mr. Lay also argues that the dumbwaiter was not an improvement but a replacement or upgrade of a pre-existing device and that the dumbwaiter was never completed as required by the statute because it was missing at least one essential safety component that was designed to prevent an accident such as this. Moreover, Mr. Lay contends that the statute is not applicable to the case because Schindler concealed the defective and unreasonably dangerous condition, and because § 402A strict liability claims do not

fall within the ambit of the statute. In his final point on appeal, Mr. Lay argues that the trial court erred in granting Schindler's JNOV based on the statute because it failed to carry its burden of proof.

### D. Schindler's Cross-appeal

On cross-appeal Schindler raises six issues. For its first point, Schindler contends that the trial court erred in denying its alternative motion for JNOV because Mr. Lay failed to make a submissible case under a strict product liability theory, in that (1) Mr. Lay failed to adduce any substantial evidence of the dumbwaiter's defective, unreasonably dangerous condition; (2) substantial evidence was not presented which would prove that the dumbwaiter was being used in a manner reasonably anticipated; and (3) there was no evidence that a product defect or failure to warn caused his injuries. In its second point, Schindler argues that the trial court erred in excluding evidence of comparative fault by not allowing Schindler to amend its answer in order to properly plead comparative fault as an affirmative defense, in denying Schindler's motion to reopen the evidence after the court ruled that the door had been opened regarding the issue of comparative fault, and in denying Schindler a new trial as a result of the errors. Schindler alleges that Mr. Lay waived the insufficient pleading because he failed to file a motion for a more definite statement, and he interjected the comparative fault issue as early as *voir dire* and opening statement. If the evidence on comparative fault had been admitted, Schindler contends that it would likely have substantially increased the percentage of fault attributed to Mr. Lay.

In Schindler's third point, it argues that the trial court erred in giving Mr. Lay's verdict directors based on MAI 25.04 and 25.05 and Schindler's comparative fault instructions and verdict form because the verdict directors did not contain the re-

quired modification language of MAI 37.01, thus prejudicing Schindler and entitling it to a new trial. In its next point, Schindler argues that these same verdict directors and comparative fault and converse instructions were given in error because they utilized different terminology to describe the alleged defective product, which created confusion and granted a roving commission, prejudicing Schindler.

In Schindler's fifth point, it contends that by refusing to admit Schindler's exhibits regarding the Kansas City inspection reports, the trial court erred. Schindler argues the exhibits were relevant to determine whether the dumbwaiter was defective as installed because the exhibits would have established the presence and approval of safety devices on the dumbwaiter which Mr. Lay claimed were not installed, thereby prejudicing Schindler. In Schindler's final point on appeal, it contends that the jury verdict was excessive because it was against the weight of the evidence and was the product of bias, passion, prejudice and sympathy and exceeded fair and reasonable compensation which entitled Schindler to a new trial or an order of remittitur.

## II. Mr. Lay's Appeal

### A. Standard of Review

■ In reviewing a trial court's rulings on motions for a JNOV, we review the evidence in the light most favorable to the jury's verdict to determine whether the plaintiff made a submissible case.[6] We look at all favorable evidence and reasonable inferences flowing therefrom, discarding all unfavorable evidence and infer-

ences.[7] We will affirm the trial court's grant of a JNOV if we find that the plaintiff failed to make a submissible case.[8] A presumption exists favoring the reversal of a JNOV.[9] Where the trial court's grant of a JNOV is based upon a conclusion of law, we review its conclusion de novo.[10]

### B. Legal Analysis

■ We will address Mr. Lay's second point on appeal and determine whether § 516.097 applies to Schindler because it is dispositive of this appeal. Then we will address Schindler's cross-appeal. Mr. Lay argues that Schindler is not protected from tort liability because Schindler's "sole connection" to the dumbwaiter was not exclusively "performing or furnishing, in whole or in part, the design, planning, or construction, including architectural, engineering or construction services, of the improvement."[11] Specifically, Mr. Lay argues that Schindler sold the dumbwaiter to Goetz, thereby transferring it into the stream of commerce, installed it, and then continued to repair and modify the dumbwaiter after installation. As a result, Schindler had more than one connection to the dumbwaiter.

Schindler and Mr. Lay both cite and rely on *Magee v. Blue Ridge Prof'l Bldg. Co., Inc.,*[12] and *Blaske v. Smith & Entzeroth, Inc.*[13] to support their contentions, but both parties interpret these cases differently. We begin our analysis by carefully reviewing these Missouri Supreme Court cases, which were handed down on the same day, in order to determine their impact on the issues presented. *Magee* fo-

6. *Seitz v. Lemay Bank & Trust Co.,* 959 S.W.2d 458, 461 (Mo. banc 1998) (citations omitted).

7. *Id.*

8. *Jungerman v. City of Raytown,* 925 S.W.2d 202, 204 (Mo. banc 1996).

9. *Faust v. Ryder Commercial Leasing & Servs.,* 954 S.W.2d 383, 388 (Mo.App. W.D.1997) (citations omitted).

10. *Jungerman,* 925 S.W.2d at 204.

11. § 516.097.2.

12. 821 S.W.2d 839 (Mo. banc 1991).

13. 821 S.W.2d 822 (Mo. banc 1991).

cuses on whether a former owner/constructor is protected under the statute while *Blaske* addresses whether *the statute covers manufacturers*. But these cases are distinguishable because in the case at hand we are asked to decide the difficult issue of whether a defendant's dual role as a *distributor* and *installer* entitle it to protection under § 516.097. This is a case of first impression. Therefore, not only have we reviewed *Magee* and *Blaske*, but we have also found cases from other jurisdictions that have adopted statutes of repose helpful to our analysis of this issue.

In order to resolve the issue of whether Schindler is protected by § 516.097, we must first define the phrase "sole connection." In *Magee* the court defined the phrase "sole connection with the improvement" as "a connection to a defective or unsafe condition of an improvement on real estate giving rise to liability." [14] In *Magee* the plaintiff was injured when she fell on the stairway in an office building. [15] She sued the builder and designer of the stairway who also happened to own the building at the time the stairway was constructed. [16] The plaintiff argued that the defendant had two connections to the real estate, one as an owner and another as a builder. [17] The court found that the defendant's connection to the unsafe condition was based solely on its relationship as a builder and designer of the stairway because the plaintiff failed to show any connection between the unsafe condition and defendant's ownership interest in the real estate. [18]

The *Magee* court, however, did not specifically define what constitutes a sole connection. Therefore, we must interpret the statute and determine the meaning of "sole connection." In doing so, we must give the words in the statute their plain and ordinary meaning. [19] Our role is to construe § 516.097 and determine the legislature's intent. [20] Thus, in order to determine the legislature's intent and ascertain the meaning of the phrase "sole connection," we will look to the plain and ordinary meaning of the language used in the statute. "Solely" has been defined by the courts to mean " 'only,' 'exclusively,' 'entirely' and 'wholly.' " [21] "Connection" is defined as "the act of connecting: a coming into or being put in contact; a social, professional, or commercial relationship in a practical or active way." [22] Therefore, we conclude that the plain and ordinary meaning of sole connection is having only one relationship with the improvement.

■ Next, we must determine if Schindler's connection to the dumbwaiter will preclude liability under the statute. The *Magee* court lists other connections that a designer, builder, or planner may have with an improvement to real property that would not necessarily exclude it from the protection of the statute. [23] Excluding "a former tenant, shareholder, employee or client of the owner ... would defeat the statutory purpose and lead to an absurd and unreasonable result." [24] The *Magee* court also notes that there must be a connection to the unsafe or defective condi-

14. *Magee*, 821 S.W.2d at 843.

15. *Id.* at 841.

16. *Id.*

17. *Id.* at 843.

18. *Id.* at 843–844.

19. *Burch Food Servs., Inc. v. Missouri Div. of Employment Sec.*, 945 S.W.2d 478, 480 (Mo. App. W.D.1997) (*citing McCollum v. Director of Revenue*, 906 S.W.2d 368, 369 (Mo. banc 1995)).

20. *Magee*, 821 S.W.2d at 843 (citations omitted).

21. *State v. Patterson*, 534 S.W.2d 847, 851 (Mo.App.1976).

22. Webster's Third New International Dictionary 481 (1971).

23. *Magee*, 821 S.W.2d at 844.

24. *Id.*

tion in some other capacity besides as a designer, builder, or constructor to fall outside of the ambit of the statute.[25] Therefore, if a defendant has any connection that gives rise to liability with respect to an improvement other than by design, planning, or construction, § 516.097 is not available as an affirmative defense.

In *Magee*, the court found that the defendant's connection to the unsafe condition was based solely on its relationship as a builder and designer of the stairway because the plaintiff failed to show any connection between the unsafe condition and defendant's ownership interest in the real estate.[26] That is not the case here. Schindler not only had a connection as an installer, but it sold and distributed the defective dumbwaiter exposing itself to strict liability. Consequently, a jury found Schindler liable for selling an unreasonably dangerous dumbwaiter without giving adequate warnings of the danger. As a result, the jury found that Mr. Lay suffered damages and awarded him over $9 million.

In *Blaske*, the issue was whether a manufacturer and seller of an air handling unit was protected under § 516.097.[27] The court reversed and remanded a motion for summary judgment because there were several unresolved factual issues, which would assist in determining whether the defendant was protected under the statute.[28] The court held that the statute only "protects persons providing architectural, engineering, and construction services." [29] In dictum, the *Blaske* court developed an "activity analysis" to assist in determining whether a manufacturer is protected under the statute of repose.[30] The focus must be on the defendant's activity. If the defendant's sole connection is as a builder or designer, then the activity associated with the design, planning and construction of a product falls within the statute. On the other hand, if a defendant is acting as a seller or distributor, then its activities are not within the statute. *Blaske* cited the reasoning in a New Mexico decision holding:

> To the extent that PPG [defendant] is sued as manufacturer or seller of the glass, PPG is not covered by the statute and the summary judgment in favor of PPG as the these claims was error. To the extent that PPG is sued as the designer or installer of the glass, PPG is covered by the statute and the summary judgment in its favor was correct.[31]

*Blaske* specifically tells us that its analysis is to be used as guidance, and that further details should be established on a case by case basis. After reviewing the New Mexico opinion and the New Mexico statute relied on in *Blaske*, we find one substantial difference. Its statute does not contain the "sole connection" language as contained in our statute.[32]

In addition, our research reveals no statute in any jurisdiction with the "sole connection" language. In fact, other jurisdictions with these types of statutes, which do not even contain the "sole connection" language, have followed our line of reasoning. These jurisdictions have held that sellers and distributors are not protected under the statute of repose. "A seller who also happens to be the builder should not be shielded from liability. Selling and building involve different activities. The statute shields builders. If builders also engage in the activity of selling, they should face the liability of sellers." [33] "[T]hese

25. *Id.*

26. *Id.* at 844.

27. 821 S.W.2d at 826.

28. *Id.* at 836.

29. *Id.* at 826.

30. *Blaske*, 821 S.W.2d at 837.

31. *Id.* at 837 (*quoting Howell v. Burk*, 90 N.M. 688, 568 P.2d 214, 223 (Ct.App.1977)).

32. N.M. Stat. Ann. § 37–1–27 (1978).

33. *Pfeifer v. City of Bellingham*, 112 Wash.2d 562, 772 P.2d 1018, 1023 (banc 1989).

statutes of repose do not protect defendants from liability for other unspecified activities, such as the manufacture or distribution of dangerous products."[34] Mr. Lay's action against Schindler involved selling a dangerous product without providing adequate warnings. Under this theory, a jury found Schindler liable. The statute does not protect Schindler's activities associated with selling a defective product. Therefore, under this analysis, if the defendant has more than one relationship with the defective or unsafe condition of an improvement on real estate that gives rise to liability, it cannot seek shelter under Missouri's statute.

Schindler relies on *Blaske* and contends that it supplied all of the specifications, design, and installation of the dumbwaiter entitling it to protection under § 516.097. In *Blaske*, the defendant was a manufacturer, and there was no evidence that the manufacturer installed its product. On the contrary, Schindler admits it did not manufacture the dumbwaiter. Schindler purchased the dumbwaiter from the manufacturer, Atlas, and sold it to the nursing home.

Mr. Lay alleged in his petition that Schindler inspected, assembled and installed the dumbwaiter at the nursing home and that all work necessary to make the dumbwaiter operational, including the custom design, assembly, selection of location and installation of the machine, electrical system and control box was done by Schindler. According to the record, Schindler denied in its answer each allegation with respect to the design and assembly of the dumbwaiter, admitting that it only installed the dumbwaiter.

The evidence, however, showed that Schindler served a dual role by selling and installing the dumbwaiter. *Blaske* assists us in determining whether Schindler can claim that it's protected from liability under the statute based on its activities of "performing or furnishing, ... construction."[35] It is clear from *Blaske* that a manufacturer is not protected by the statute when it manufactures a standard product available to the general public and does not participate in substantial on-site production.[36] Schindler contends that it has two arguments to support its claim that it is protected under the statute based on *Blaske*. In dictum, the *Blaske* court outlined two ways a manufacture could be covered under the statute:

First, a manufacturer may claim that its activity in fabricating, assembling or manufacturing building materials or a component part incorporated within the real property in the construction of the improvement "is, performing or furnishing, ... construction, including ... construction services, of the improvement."

\* \* \*

The second contention a manufacturer ... may make to gain the protection of the statute is to argue that it performed or furnished design, planning or engineering devices by reason of the design and engineering activities involved in developing its product.[37]

In the first test, the court suggested that a manufacturer that also participates in on-site construction or "substantial participation at the construction site in significant activities in installing or incorporating the product into the real

34. *Blikre v. ACandS, Inc.*, 593 N.W.2d 775, 779 (N.D.1999). *See also Purcell v. Asbestos Corp., Ltd.*, 153 Or.App. 415, 959 P.2d 89, 97–98 (1998), *modified on other grounds*, 155 Or.App. 1, 963 P.2d 729 (1998) (installer can still be held liable for products made or sold when claims are based on distribution and sales of the product); *State Farm v. W.R. Grace & Co.–Conn.*, 24 F.3d 955, 957 (7th Cir.1994) (interpreting an Illinois statute of repose holding that the defendant's failure to

test a product and failure to warn about it were not the kinds of activities the statute was intended to protect).

35. § 516.097.2

36. *Blaske*, 821 S.W.2d at 837.

37. *Id.* at 837–38; § 516.097.2.

property would constitute 'performing or furnishing ... construction, including ... construction services, ...' "[38] First, substantial on-site construction is only a factor to be considered. Second, we find that the "substantial on-site construction" test is more than simply assembling a prefabricated product. Schindler argues that assembling the dumbwaiter is equivalent to constructing the dumbwaiter and passes the "substantial construction" test outlined in *Blaske* entitling it to the protection of the statute. We disagree.

Again, we look to the legislature's intent and the plain and ordinary meaning of the statute. Assemble means "to fit together various parts of so as to make into an operative whole."[39] Construct is "to form, make, or create by combining parts or elements."[40] When Schindler purchased the dumbwaiter from Atlas, it was already formed and created. Schindler was only required to put the various parts together to make an operative whole. Schindler did not create or form any piece of the dumbwaiter. · Atlas may have been responsible for constructing the dumbwaiter, but Schindler was not. Furthermore, the statute does not contain the words "assemble" and "fabricate." It states that it applies to "any person whose sole connection with the improvement is performing or furnishing, in whole or in part, the design, planning, or construction, including architectural, engineering or construction services, of the improvement."[41] To construe the statute otherwise would violate the rules of statutory construction. If the legislature· intended to include assembly and fabricating, it would have used these terms in addition to construction and design. Therefore, since the legislature did not include the term assemble or fabricate, we will not expand the scope of the statute

and will interpret it using the plain and ordinary meaning of the words. Thus, assembly is not sufficient to allow Schindler the protection of the statute.

██ Finally, although Schindler did participate in the on-site construction, it failed to prove that it participated in "substantial" on-site construction. Since the statute is an affirmative defense, Schindler has the burden of proof.[42] The record reveals that Schindler failed to prove that it participated in substantial on-site construction. Schindler sold and installed a prefabricated product, and therefore, cannot claim that it constructed the dumbwaiter.

Moreover, the evidence showed that Atlas constructed the dumbwaiter. Atlas provided Schindler a quotation and layout for the dumbwaiter. Several exhibits contained in the record indicate that Atlas was responsible for the design and construction of the dumbwaiter. The estimate sheet provided by Atlas for Allied (Schindler) indicated that Atlas measured the space where the dumbwaiter would be placed and drew up a preliminary sketch of the product demonstrating how it would work. The blueprint contained measurements and the estimate sheet contained all of the essential components necessary to install the product including the buffers and pan. The quotation sheet also provided by Atlas noted what was included and what items were not included in the sale of the dumbwaiter.

> NOT INCLUDED (sic) are the hatchway doors, interlocks and com, the field wiring material, (about $25.00), field erection bolts, (about $5.00), access door, car gate and contact, sales tax.

---

**38.** *Blaske,* 821 S.W.2d at 837; *see* also § 516.097.2.

**39.** Webster's Third New International Dictionary 131 (1971).

**40.** Webster's Third New International Dictionary 489 (1971).

**41.** § 516.097.2

**42.** *State ex rel. Morasch v. Kimberlin,* 654 S.W.2d 889, 892 (Mo. banc 1983) (Blackmar, J., concurring in the result).

WE DO INCLUDE (sic) the engineering drawings, hoist cables on the drum and shackled, conductor cord on and wired to the car, crating and freight.

Then when Allied (Schindler) sent the estimate to Goetz, it stated that Allied proposed to *furnish* and *install* one Atlas Electric Dumbwaiter. Describing the dumbwaiter as an "Atlas Electric Dumbwaiter" indicated that Atlas designed and constructed the product. The specifications for the dumbwaiter, which Allied sent to Goetz, were exactly the same as those Atlas initially sent to Allied. The proposals were identical indicating that Allied transferred all of the specifications and descriptions from the Atlas proposal when Allied sent it to Goetz. Correspondence between Allied and Atlas after the purchase of the dumbwaiter also indicated that Atlas constructed the dumbwaiter. In a letter from Allied to Atlas, Allied noted that the specifications for the controller in the drawings Atlas supplied were correct, but that Atlas designed the controller at a different size. Allied indicated that it had to rewire for it and add relays. But simply tweaking a product does not amount to substantial construction as contemplated by the statute. Another exhibit reveals that Allied purchased the access door from Star Sales and Erection Company and then resold and installed it on the Atlas dumbwaiter.

We are aware that in order to install the dumbwaiter, Schindler had to assemble the parts supplied and designed by Atlas. But this does not qualify as substantial on-site construction, and Schindler's argument under the first test fails.

In the second test, the court suggests that if a manufacturer designs, plans, or furnishes a uniquely designed product, as opposed to a product generally available to the public, it can seek protection under the statute. Again, Schindler did not manufacture the dumbwaiter. Schindler argues that it participated in the planning of the design for the dumbwaiter because it provided measurements to Atlas so that the dumbwaiter could be built specifically for the nursing home. Schindler directs us to the quotation provided to Allied from Atlas. Indeed it does contain specific measurements and specifications, but Atlas provided them to Allied on May 25, 1964. Then on Allied's letterhead, it copied the same measurements and specification contained on the Atlas forms and sent it to Goetz on May 28, 1964. The record fails to indicate how Atlas received the information contained on its quotation form. Therefore, Schindler failed to show that it participated in the planning of the design for the dumbwaiter.

This reasoning is consistent with the purpose for adopting the doctrine of strict liability in tort as set forth in the Restatement (Second) of Torts, § 402A (1965). "One who 'sells' a 'product' in a defective condition, unreasonably dangerous to the user or consumer is subject to liability for injury caused by the defect."[43] "The whole purpose of 'products liability law, essentially, is to socialize the losses caused by defective products.'"[44] Accordingly, the Restatement (Second) states that any person who is "engaged in the business of selling products for use or consumption" is subject to liability. The rule applies to "any manufacturer of such a product, [and] to any wholesale or retail dealer or distributor ..."[45] "Parties in the chain of distribution of a product, including manufacturers, sellers, wholesale distributors or other middlemen in the manufacturing and selling process come within the umbrella of

---

**43.** *Welkener v. Kirkwood Drug Store Co.*, 734 S.W.2d 233, 240–41 (Mo.App. E.D.1987).

**44.** *Id.* at 241 (*quoting Lippard v. Houdaille Indus. Inc.*, 715 S.W.2d 491, 492 (Mo. banc 1986)).

**45.** Restatement (Second) of Torts, § 402A, comment f, at 350 (1965).

the rule." [46] If a middleman in the selling process is allowed to seek protection from liability because it also installed a prefabricated product, then we essentially eliminate a class of defendants that were not intended to be sheltered under products liability law. Therefore, we hold that the legislature did not intend to protect sellers in this situation.

### III. Schindler's Cross-appeal

### A. Submissible Case Under § 402A Strict Products Liability

Schindler argues on cross-appeal that the trial court should have granted its motion for JNOV because Mr. Lay failed to make a submissible case under strict products liability in that he failed to present any substantial evidence of a defective dumbwaiter, which created an unreasonably dangerous condition. Further, Schindler contends that Mr. Lay failed to prove that the dumbwaiter was being used in a manner reasonably anticipated, and that Mr. Lay failed to prove that the product defect or failure to warn caused Mr. Lay's injuries.

### 1. Standard of Review

■■■■■. Mr. Lay alleges that the trial court erred in granting Schindler's JNOV on Mr. Lay's claim for strict liability. "A contention that the trial court improperly entered JNOV raises the question of whether the plaintiff has made a submissible case." [47] On appeal, we review the trial court's order and determine if a submissible case is made by viewing "the evidence in a light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable inferences that can be drawn from the evidence." [48] "A presumption favoring the reversal of a grant of JNOV exists, unless the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to differ as to the outcome." [49]

### 2. Legal Analysis

■■■ The Supreme Court recognized a cause of action for strict products liability in *Keener v. Dayton Elec. Mfg. Co.* [50] The Court adopted the Restatement (Second) of Torts, § 402A. [51] The essential elements of a strict product liability claim are (1) the defendant sold a product in the course of its business; (2) the product was then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold. [52]

"The purpose of strict products liability is to socialize losses associated with and caused by defective products." [53] Furthermore, we have concluded that manufacturers and sellers are economically and socially responsible when they place a defective

---

**46.** *Welkener,* 734 S.W.2d at 241 (*citing* 1 *Amer. Law Prod. Liab.*3d §§ 5.4, at 13, 5.5, at 15, 5.6, at 16–17 (1987); 2A L. Frumer and M. Friedman, *Products Liability,* § 6.18 at 6–252 *et seq.; Vandermark v. Ford Motor Co.,* 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964); *Kopp v. C.C. Caldwell Optical Co.,* 547 S.W.2d 872 (Mo.App.1977); *Means v. Sears Roebuck & Co.,* 550 S.W.2d 780 (Mo. banc 1977); 63 Am.Jur.2d, *Products Liability,* § 572 at 816 (1984)).

**47.** *Sloan v. Bankers Life & Cas. Co.,* 1 S.W.3d 555, 564 (Mo.App. W.D.1999) (citations omitted).

**48.** *Id.* (*citing Jungerman v. City of Raytown,* 925 S.W.2d 202, 204 (Mo. banc 1996)) (citations omitted).

**49.** *Sloan,* 1 S.W.3d at 564 (citations omitted).

**50.** 445 S.W.2d 362, 364 (Mo.1969).

**51.** *Id.*

**52.** *Rauscher v. General Motors Corp.,* 905 S.W.2d 158, 160 (Mo.App. E.D.1995); *see also Keener,* 445 S.W.2d at 364.

**53.** *Mulligan v. Truman Med. Ctr.,* 950 S.W.2d 576, 582 (Mo.App. W.D.1997) (*citing Lippard,* 715 S.W.2d at 492).

product on the market because injured parties are unable to protect themselves.[54]

 Mr. Lay offered substantial evidence to prove that Schindler sold the dumbwaiter to Goetz in the course of its business. In its answer, Schindler admitted selling the dumbwaiter to Goetz in 1964. Invoices of the sale were also admitted into evidence.

Next, we must consider whether Mr. Lay presented sufficient evidence that would allow a jury to decide if the dumbwaiter as sold created an unreasonable risk of danger to Mr. Lay when put to normal use.[55] In order to determine whether Mr. Lay made a submissible case, we must examine the sufficiency of the evidence. He is entitled to the most favorable view and the benefit of all inferences drawn based on all of the evidence.[56]

Mr. Lay argues that when Schindler sold the dumbwaiter to Goetz, it was in a defective condition unreasonably dangerous when put to a reasonably anticipated use. He elicited testimony from expert witness Dr. Mark Lawrence, who testified that in his opinion, it is reasonable to expect that workers would get under the dumbwaiter at the bottom of the shaft for servicing because there was no other way to access the equipment. Furthermore, he explained that the dumbwaiter required maintenance, which would require a worker to get into the shaft to maintenance the equipment. He opined that it was reasonably foreseeable that a worker would lean in through the hoistway door because the buffer pan was not there, there was no access from the other side and access from underneath was difficult from the side where there was an access panel. Moreover, he concludes that Mr. Lay had no safe place to work.

The proposal exhibit sent to Goetz from Schindler indicated that a buffer was to be supplied with the dumbwaiter in order to cushion stops in the event of over-travel. But Dr. Lawrence testified that there was no evidence that the dumbwaiter contained the buffer system as installed. He concluded that since there was no scraping, discoloration, gouging, nicks, or any other indication that the dumbwaiter had made contact with a buffer system at any time, then no buffer system had been installed. Further, he testified that in his opinion the dumbwaiter was defective and unreasonably dangerous when Schindler sold it to the nursing home. Therefore, there was sufficient evidence for a jury to conclude that Schindler sold a defective dumbwaiter, and that Mr. Lay was using and repairing the dumbwaiter as was reasonably anticipated.

Dr. Lawrence also opined that Mr. Lay's injuries were caused by the lack of safe and adequate access to the equipment, and if dumbwaiter contained the buffer system, it would have stopped the falling dumbwaiter car. Thus, Mr. Lay had sufficient evidence to present his strict products liability claim under § 402A to a jury. The trial court correctly denied Schindler's motion for JNOV on this ground.

## B. Sufficiency of Schindler's Pleadings

### 1. Standard of Review

 We review the denial of a motion for new trial under the abuse of discretion standard, which occurs when the ruling offends the logic of the circumstances and was so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration.[57] "The trial court is presumed to have weighed and considered the evidence and the possibility of prejudice to the par-

---

54. *Id.*

55. *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375 (Mo. banc 1986) (citations omitted).

56. *Id.* at 378.

57. *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993).

ties prior to rendering its decision regarding the extent of the new trial." [58]

## 2. Legal Analysis

In its next point on appeal, Schindler argues that the trial court erred by failing to grant it a new trial because the trial court excluded evidence of Mr. Lay's comparative fault on the grounds that Schindler failed to adequately plead comparative fault as an affirmative defense. Schindler asked the court for leave to amend his pleading, but the trial court denied his motion. Schindler also asked the court to reopen the evidence on comparative fault after the trial was underway because it claimed that Mr. Lay opened the door as early as *voir dire* and throughout his case in chief. Further, Schindler asserts that Mr. Lay waived his right to object about Schindler's pleadings because he did not file a motion for more definite statement. As a result, the jury's percentage of fault attributed to Mr. Lay was substantially affected.

We disagree with Schindler's contention that Mr. Lay waived his right to object about the sufficiency of its pleading. Mr. Lay sent his motion *in limine* to Schindler on April 16, 1999, the hearing took place on April 26, 1999, and the trial began on May 3, 1999. Mr. Lay argued in his motion that Schindler failed to plead the specific statute under comparative fault, and that it failed to plead the specific subsections under § 537.765. Further, he asked the court to preclude all evidence of comparative fault because it was outside the scope of the pleadings. Schindler, however, failed to take any action even after Mr. Lay put Schindler on notice that the pleading failed to allege specific facts. Moreover, Schindler admitted that it had to plead comparative fault in a product's lia-

bility case under the six categories listed in the statute. After being put on notice of the pleading deficiency, there was sufficient time for Schindler to file an amended answer prior to the trial date in order to comply with the pleading requirements for comparative fault. Consequently, Schindler prepared the amended answer for the April 26 hearing, but did not file it.

The motion alleged that Schindler failed to plead specific facts to support the defense. The court took the motion under advisement in case Mr. Lay failed to object to the evidence at trial. But during Schindler's opening statement, Mr. Lay objected when Schindler referred to Mr. Lay's role in the accident. The court sustained the objection because it was outside the scope of the pleadings. Schindler then asked the court for leave to amend its answer, and the court denied the motion.

■■■■ Rule 55.33 provides that leave to amend "shall be freely given when justice so requires." "The decision of the trial court to allow an amendment of a pleading after trial has commenced is a discretionary matter which we will not overturn unless that discretion has been clearly abused." [59] We consider factors such as: (1) the hardship to the moving party if leave to amend is denied; (2) the reasons for the moving party's failure to include the matter in the original pleading; (3) the timeliness of the application; (4) whether the amendment could cure the inadequacy of the moving party's pleading; and (5) the injustice to the nonmoving party should leave be granted.[60]

The trial court did not abuse its discretion by denying Schindler's motion to amend its pleading. The court noted that Schindler should have asked for leave to amend at the April 26th hearing since the

---

58. *Sloan*, 1 S.W.3d at 567 (*quoting Phillips v. Lively*, 708 S.W.2d 369, 373 (Mo.App. W.D. 1986)).

59. *Marvin E. Nieberg Real Estate Co. v. Taylor–Morley–Simon, Inc.*, 867 S.W.2d 618, 625 (Mo.App. E.D.1993) (citation omitted).

60. *St. Anthony's Med. Ctr. v. H.S.H*, 974 S.W.2d 606, 612 (Mo.App. E.D.1998).

amended answer was prepared and ready to file. In fact, the court noted that Schindler knew about the deficiency as early as April 16th. The case was tied up in discovery for two years, and Mr. Lay's experts were present and prepared to testify. Allowing Schindler leave to amend would have financially burdened and substantially prejudiced Mr. Lay.

### 3. Opening the Door to Comparative Fault

■■■ We give great deference to the trial court's evidentiary rulings and will not overturn such decisions absent an abuse of discretion.[61] The decision whether to reopen a case to permit the introduction of evidence is a matter within the trial court's discretion. The decision of the trial court will not be interfered with on appeal, unless it appears that injury has resulted to the complaining party. Otherwise, there is no abuse of discretion. We will not reverse a judgment based upon the exclusion of evidence unless an appellant shows us the evidence would have materially affected the merits of his or her cause of action.[62]

■■■ Schindler moved for the trial court to reopen the evidence during the instruction conference. Schindler wanted the opportunity to cross-examine Mr. Lay, William Larson and Richard Larson. The court denied its request because Schindler failed to recall these witnesses during its case in chief. Further, the comparative fault evidence Schindler sought to introduce was not so material that it would have produced a different jury verdict. The jury still could have believed that the injury resulted from a defective dumbwaiter. There was ample evidence that still would have allowed the jury to find for Mr. Lay.[63] Assuming *arguendo*, even if the testimony would have produced a different result, Schindler had an opportunity to recall Mr. Lay, Richard Larson, and William Larson to testify during its case in chief and Schindler chose not to call them.

■■■ Schindler also had ample opportunity during the trial to introduce and to explain the evidence it later sought to adduce. The court ruled that the door was opened during Mr. Lay's case in chief. Schindler had its entire case to present evidence on comparative fault and part of Mr. Lay's case under cross-examination. Schindler waited until it had adjourned its case before asking the court to reopen the evidence. Schindler also had an opportunity to argue comparative fault during closing arguments. "Courts cannot reopen cases merely because a party has had a change of heart regarding the importance of evidence it chose not to introduce when it first had the opportunity to do so."[64]

In conclusion, Schindler has not demonstrated the requisite injury from the trial court's denial of his motion to reopen the evidence. Schindler has not shown that the evidence it now seeks to introduce would substantially change the outcome of the suit. Furthermore, denying Schindler's request to reopen the evidence was not an abuse of discretion. An instruction on comparative fault was submitted to the jury, Schindler was allowed to cross-examine Mr. Lay's witness about the use of safety equipment, and Schindler extensively argued comparative fault during its closing argument. The jury considered the evidence on comparative fault resulting in an apportionment of fault to Mr. Lay. Any error resulting from the denial of Schindler's motion to reopen the case was harmless, which is not grounds for reversal.[65] Point denied.

---

**61.** *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991) (citations omitted).

**62.** *Lewis v. Wahl,* 842 S.W.2d 82, 84–85 (Mo. banc 1992); § 512.160.2; Rule 84.13(b).

**63.** *See Fowler v. S–H–S Motor Sales Corp.,* 560 S.W.2d 350, 357 (Mo.App.1977).

**64.** *Warren v. Warren,* 784 S.W.2d 247, 256 (Mo.App. W.D.1990).

**65.** *Fowler,* 560 S.W.2d at 358.

## C. Instructions

### 1. Standard of Review

 In order to overturn a jury verdict based on an erroneous instruction, the complaining party must show that the error was prejudicial or that the instruction "misdirected, misled, or confused the jury."[66]

### 2. Legal Analysis

#### a. Roving Commission Instruction

 Schindler objected to the language disparity between instructions six and seven offered by Mr. Lay and instructions eight through eleven offered by Schindler. In Mr. Lay's instructions, he used the phrase "dumbwaiter assembly," and Schindler used the phrase "dumbwaiter system." Schindler contends that intermingling these terms caused the jury confusion and gave the jury a roving commission.

 "A 'roving commission' occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury 'to roam freely through the evidence and choose any facts which suited its fancy or its perception of logic' to impose liability."[67] Schindler argues that "assembly" connotes the act of assembling or installing the allegedly defective product, as opposed to referring to the product itself. There was no dispute that Schindler installed the dumbwaiter. Further, "assembly" is defined as "a collection of parts so assembled as to form a complete machine, structure, or unit of a machine."[68] "System" is defined as "to bring together, combine[;] ... an aggrega-

tion or assemblage of objects joined in regular interaction or interdependence."[69] An average jury would not be confused by the different terms because they are defined similarly.

 Moreover, Schindler neither offered a definitional instruction explaining that the terms meant the same thing nor offered a modified instruction incorporating his term preference. Failing to request a modified instruction can be considered in determining whether an instruction is prejudicial.[70] Therefore, Schindler's argument that the jury was confused or misled by the different terminology is without merit. Point denied.

#### b. Comparative Fault Instruction

 Schindler also contends that the trial court erred in giving Mr. Lay's verdict directing instructions numbers six and seven based on MAI 25.04 and 25.05 because Schindler offered comparative fault instructions, and the verdict directors did not contain the required modified language of MAI 37.01.

 When an instruction is submitted and deviates from the MAI format, the appropriate appellate review requires a four-step analysis: (1) if MAI prescribes a particular form of instruction its submission is mandatory because if the MAI instruction is not given, prejudicial error is presumed; (2) the submitting party has the burden of demonstrating that the instruction did not create a prejudicial effect; (3) the court must determine if the instruction created such a prejudicial effect; and (4) in order to be grounds for reversal, the error must materially affect the merits of the case.[71] We no longer

---

66. *Snelling v. Cernech,* 755 S.W.2d 259, 265 (Mo.App. W.D.1988) (*quoting Joseph v. Elam,* 709 S.W.2d 517, 524 (Mo.App. E.D.1986)).

67. *Seitz,* 959 S.W.2d at 463 (*quoting Davis v. Jefferson Sav. & Loan Ass'n,* 820 S.W.2d 549, 556 (Mo.App. E.D.1991)) (add'l citations omitted).

68. Webster's Third New International Dictionary 131 (1971).

69. Webster's Third New International Dictionary 2322 (1971).

70. *Hudson v. Carr,* 668 S.W.2d 68, 71–72 (Mo. banc 1984).

71. *Citizens Bank of Appleton City v. Schapeler,* 869 S.W.2d 120, 128 (Mo.App. W.D.1993) (citation omitted).

automatically reverse instructional errors unless the record indicates that the error substantially prejudiced a party.[72]

Both parties objected to the verdict directing instructions numbers six and seven because they were not modified for the submission of comparative fault. Mr. Lay submitted verdict directors, instruction numbers six and seven, based upon MAI 25.04 and 25.05, respectively. Instruction number six provides:

Your verdict must be for plaintiff Johnnie Lay if you believe:

First, defendant sold the subject dumbwaiter assembly in the course of defendant's business, and

Second, the subject dumbwaiter assembly was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the subject dumbwaiter assembly was used in a manner reasonably anticipated, and

Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the subject dumbwaiter assembly was sold.

Instruction seven provides:

Your verdict must be for plaintiff Johnnie Lay if you believe:

First, defendant sold the subject dumbwaiter assembly in the course of defendant's business, and

Second, the subject dumbwaiter assembly was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and

Third, defendant did not give an adequate warning of the danger, and

Fourth, the product was used in a manner reasonably anticipated, and

Fifth, plaintiff was damaged as a direct result of the subject dumbwaiter assembly being sold without an adequate warning.

Schindler submitted instructions on comparative fault based on § 537.765 and argues that the Notes on Use for MAI 25.04 and 25.05 require that if comparative fault under § 537.765 is applicable, Chapter 37.00 applies for submission of a comparative fault instruction. Further, MAI 37.01 requires modification of verdict directing instructions directing an assessment of fault in a comparative fault case.

If instructions six and seven were modified, the opening paragraph would have read, "In your verdict you must assess a percentage of fault to defendant whether or not plaintiff was partly at fault if you believe...." This paragraph would have been consistent with the comparative fault instructions Schindler submitted. Mr. Lay attempted to submit the modified instructions, but the court rejected them and submitted the unmodified versions. Schindler now argues that this created a prejudicial effect.

In *Morrison*, this court has held that when § 537.765 is applicable, comparative fault instructions should by submitted under Chapter 37.00.[73] MAI 37.01 should be used to modify plaintiff's verdict director.[74] Although the facts were slightly different in *Morrison*, the court clearly acknowledges that the plaintiff's verdict director should be modified to reflect the defendant's comparative fault instruction.[75] We agree that the Supreme Court approved instructions and verdict forms to be used in comparative fault cases.[76] Therefore,

**72.** *Id.* (citation omitted).

**73.** *Morrison v. Kubota Tractor Corp.,* 891 S.W.2d 422, 432–33 (Mo.App. W.D.1994).

**74.** *Id.*

**75.** *Id.* In *Morrison,* the defendant argues that its affirmative defense instruction for comparative fault under MAI 32.23 should have been

modified by MAI 37.01. The court held that MAI 37.01 is only used to modify plaintiff's verdict director, not defendant's comparative fault instruction.

**76.** MAI 37.01–37.07 (1986 new); *see also Earll v. Consol. Aluminum Corp.,* 714 S.W.2d 932, 936 (Mo.App. E.D.1986).

since the trial court did not submit the mandatory modified instruction we presume it had a prejudicial effect.

Mr. Lay has the burden of demonstrating that the instruction did not create a prejudicial effect since he submitted the erroneous instruction. He objected to the instruction upon submission and offered the correct instruction. The trial court denied his request to offer the modified instruction. The trial court, however, submitted Schindler's comparative fault instruction.

Despite the discrepancy in the introductory paragraphs of the verdict directors and the affirmative defense instructions, the jury allocated fault between Schindler and Mr. Lay. It found Mr. Lay one-third at fault. The introductory phrase on the comparative fault instruction directs the jury to allocate a percentage of fault to the defendant whether or not it believes the plaintiff was at fault. The jury did just that and assessed Schindler sixty-six percent at fault. The verdict director contained the required elements of strict liability and otherwise followed MAI verbatim. Therefore, the jury was not misdirected, misled or confused by the instruction. Thus, the unmodified instruction neither caused a prejudicial effect nor affected the merits of the case. Point denied.

### D. Exhibits 102 and 107

 We review the admission or exclusion of evidence on an abuse of discretion standard. We determine whether the trial court abused its discretion by refusing to admit evidence and not whether the evidence was admissible.[77] "Failure to admit evidence does not mandate a reversal of a judgment unless the error materially affected the merits of the action."[78] We will reverse only where the error is so prejudicial as to deny Schindler a fair trial.[79]

 Abuse of discretion is a ruling clearly against the logic of the circumstances, so arbitrary and unreasonable as to shock the sense of justice, and lacking careful consideration.[80] A trial court has great discretion when determining the admissibility of evidence. "We will not reverse unless there is a substantial or glaring injustice."[81] If any ground exists for excluding the evidence, we will uphold the trial court's decision to exclude it.[82] Therefore, we are not bound by either trial court's reasons for refusing the evidence or the complaining party's objections to the admissibility of the evidence.[83]

Schindler contends that the court erroneously refused to admit two exhibits, Kansas City Inspection Reports, because they were relevant to show that the dumbwaiter was not defective as installed. Exhibit 102 would have shown that that in 1987 the dumbwaiter buffers were satisfactory at the time of inspection, rebutting Mr. Lay's evidence that the buffer system was not installed on the dumbwaiter. Exhibit 107 was offered to show that when the dumbwaiter was installed in 1964, no defects were identified on the inspection report, and to show that the dumbwaiter was completed upon installation in 1964.[84]

77. *Aliff v. Cody*, 26 S.W.3d 309, 315 (Mo.App. W.D.2000) (citations omitted).

78. *Id.* (quoting *Envtl. Waste Mgmt., Inc. v. Indus. Excavating & Equip., Inc.*, 981 S.W.2d 607, 613 (Mo.App. W.D.1998)).

79. *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998) (citation omitted).

80. *Rasse v. City of Marshall*, 18 S.W.3d 486, 489 (Mo.App. W.D.2000) (citations omitted).

81. *Aliff*, 26 S.W.3d at 315 (quoting *State ex rel. Mo. Highway and Transp. Comm'n v.* *Pracht*, 801 S.W.2d 90, 93 (Mo.App. E.D. 1990)).

82. *Id.*

83. *Id.* at 314–15.

84. Under § 516.097, completion is a factor in determining whether Schindler is protected from liability. We do not address this issue since we hold *supra* that Schindler falls outside the ambit of the statute because of its connection with the dumbwaiter.

As to exhibit 102, the witness was allowed to testify regarding the exhibit. The jury heard the relevant information and could choose to believe it or disregard it. The court received the information into evidence but refused to admit the actual document. Therefore, assuming *arguendo*, even if the report was admissible, the trial court's refusal to receive it into evidence was not prejudicial. The trial court did not abuse its discretion by refusing exhibit 102, and Schindler was not prejudiced by the exclusion of the document.

Exhibit 107 was excluded because it invaded the province of the jury. Schindler offered it after an offer of proof. Mr. George W. Gibson, Schindler's expert witness, testified regarding the inspection record and whether it complied with certain federal codes within the industry. "[C]ompliance with the minimum federal standards does not mitigate a manufacturer's responsibility under the theory of strict liability...."[85] *Johnson v. Hannibal Mower Corp.* focused on the same type of standards under the American National Standards Institute (ANSI).[86] The facts are similar. In *Johnson*, a lawn mover was found defective under § 402A.[87] At the time the lawn mover was manufactured, the ANSI standards did not require certain safety equipment, which the plaintiff claimed, rendered the product defective and dangerous.[88] The only question before the jury in a strict liability action is whether the product was defective not whether the manufacturer knew it was defective or was negligent. Fault is irrelevant. Therefore, the ANSI standards were considered inadmissible and the court deemed their admissibility to be prejudicial error materially effecting the merits of the case.[89]

Mr. Gibson testified that the standards are generally accepted and reasonably relied on in the industry, and that he relied on the standards in rendering his opinion. Further, Mr. Gibson testified that the code did not require the dumbwaiter to contain safeties at the time it was installed. Thus, in light of the *Johnson* decision, we hold that the trial court properly refused to admit exhibit 107 because that inspection was based on the ANSI standards in effect at that time, and those standards are clearly inadmissible in a strict liability claim.

Moreover, since Schindler falls outside the ambit of the § 516.097 for reasons stated *supra*, the issue of completion is irrelevant. Thus, excluding exhibit 107 did not prejudice any party. Point denied.

### E. Excessive Verdict

Finally, Schindler argues that the trial court erred in denying it a new trial because the jury's verdict was excessive in that it was against the manifest weight of the evidence and was the product of bias, passion, prejudice, and sympathy. Further, Schindler alleges that it exceeded fair and reasonable compensation thereby entitling Schindler to a new trial or remittitur.

The jury assessed damages in the amount of $15,000,000. The trial court reduced the damage award by one-third for comparative fault against Mr. Lay for a total judgment of $9,252,500.

The issue of damages is primarily for the jury to decide.[90] Remittitur is appropriate when the court finds that the jury's award is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's in-

**85.** *Johnson v. Hannibal Mower Corp.,* 679 S.W.2d 884, 885 (Mo.App. W.D.1984) (*quoting Cryts v. Ford Motor Co.,* 571 S.W.2d 683, 689 (Mo.App.1978)).

**86.** *Id.*

**87.** *Id.*

**88.** *Id.*

**89.** *Id.*

**90.** *Emery v. Wal–Mart Stores, Inc.,* 976 S.W.2d 439, 448 (Mo. banc 1998) (citation omitted).

juries and damages.[91] We give the trial court broad discretion in deciding whether to accept the verdict or to set it aside because it is excessive.[92] But when a jury's bias and prejudice result in an excessive verdict a new trial is required.[93] Moreover, we "will interfere only when the verdict is so excessive it shocks the conscience of the court and convinces the appellate court that both the jury and the trial court abused its discretion."[94] The size of the verdict alone is not sufficient to show bias, passion, prejudice, or sympathy, and in order for us to grant a new trial, "[t]he complaining party must show that the verdict, viewed in the light most favorable to the prevailing party, was glaringly unwarranted and that some trial error or misconduct of the prevailing party was responsible for the prejudicing the jury."[95]

Schindler failed to demonstrate that the trial court erred or that Mr. Lay committed any misconduct which lead to prejudicing the jury. Schindler alleges that the jury was prejudiced because the trial court allowed the jury to view several gruesome photographs of Mr. Lay taken at the hospital directly after the accident. Schindler did not address its objection on appeal, and we refuse to review it. Therefore, Schindler has not addressed any trial error that is severe enough to result in a new trial.

 In the alternative, Schindler contends that the award was excessive and that the trial court erred by not reducing it. In determining whether an award is excessive, we look to a number of factors including: (1) loss of income, both present and future; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic consider-

ations; (6) awards given and approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages.[96] Missouri appellate courts no longer engage in close scrutiny of the amounts awarded by juries for personal injuries since the trial court is in a much better position than we are to assess the verdict.[97]

 The testimony at trial established the Mr. Lay suffered $790,000 in future lost wages as a result of his injuries. His medical expenses as of the date of trial totaled $181,829. A strong possibility exists for future medical expenses because the plates inserted in his head are susceptible to infection. He suffered a massive head injury, which has required several surgeries. He has chronic dizziness, blindness, drooling, no sense of smell or taste, headaches, hearing loss, pain and discomfort, airway obstruction, and has difficulty fighting life-threatening infections. Mr. Lay was fifty years old at the time of trial with a life expectancy of another thirty-one years, and he is unable to maintain employment. This award based on Mr. Lay's injuries, does not shock the conscience of this court. We, therefore, find that sufficient evidence supports the jury's award for damages, and the trial court did not abuse its discretion in denying remittitur. Point denied.

## IV. Conclusion

For reasons set out above, the judgment granting Schindler's motion JNOV is reversed and the case is remanded and the trial court shall issue an order reinstating the jury's verdict in favor of Mr. Lay.

91. *Id.*

92. *Id.* (citations omitted).

93. *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 175 (Mo.App. W.D.1997).

94. *Emery*, 976 S.W.2d at 448.

95. *Willman v. Wall*, 13 S.W.3d 694, 699 (Mo. App. W.D.2000) (*quoting Letz*, 975 S.W.2d at 175).

96. *Emery*, 976 S.W.2d at 448.

97. *Smith v. Kovac*, 927 S.W.2d 493, 499 (Mo. App. E.D.1996).

Furthermore, we reject Schindler's points in the cross-appeal.

LOWENSTEIN and LAURA DENVIR STITH, JJ., concur.