In the Missouri Court of Appeals
 Eastern District
 DIVISION THREE

CHRISTOPHER WESTMORELAND, ) No. ED107787
 )
 Respondent, ) Appeal from the Circuit Court of
 ) the City of St. Louis
vs. ) 1522-CC11013
 )
MIDWEST ST. LOUIS, LLC d/b/a, ) Honorable Elizabeth B. Hogan
GAS MART 6, )
 )
 Appellant. ) Filed: February 23, 2021

 OPINION

 A 2012 gasoline price war between two neighboring gas stations, Appellant Midwest St.

Louis and the non-party Energy Express, located near Interstate 70 and Grand Avenue in the City

of St. Louis, gave rise to this case of first impression brought by Respondent Christopher

Westmoreland, who owned a third station nearby, and requires us to construe the private cause

of action created by § 416.635 of the Motor Fuel Marketing Act (MFMA), §§ 416.600 –

416.635.1

 The MFMA, adopted by the Missouri legislature in 1993 to protect competition in the

retail motor fuel market and prevent the harm caused by monopolistic takeovers in the

marketplace through predatory pricing,2 makes it unlawful to sell gas below market cost with the

1
 All statutory references are to the Revised Statutes of Missouri (2012).
2
 Ports Petroleum Co., Inc. of Ohio v. Nixon, 37 S.W.3d 237, 241 (Mo. banc 2001).
intent to damage competition, or to divert sales or trade from or otherwise injure a competitor. §

416.615.1. The Act gives the attorney general broad investigative and enforcement authority. It

also creates a private right of action for “[a]ny person injured in his business or property” as a

result of the unlawful conduct proscribed by the Act. § 416.625; § 416.635.

 Here, the private cause of action was brought by Respondent Westmoreland who owned

Go West Mart, the third gas station involved in this case, which was located near the two

aforementioned belligerents. On November 5, 2015, Westmoreland filed suit against Midwest

alleging that in 2012, Midwest repeatedly sold fuel below cost in violation of the MFMA and

caused him to suffer substantial business losses, to lose his business through a bank foreclosure,

and to suffer an approximately $500,000 judgment taken against him personally.

 The jury agreed. Following a three-day trial in October 2018, the jury awarded

Westmoreland $1.8 million in damages against Midwest. Pursuant to the mandatory provisions

of § 416.635(1), the trial court trebled Westmoreland’s damages to $5.4 million and awarded

him $200,000 in attorney’s fees and $1,161.80 in taxable costs.

 Midwest now appeals. In Points I and II, Midwest argues that Westmoreland failed to

make a submissible case under the MFMA because as a mere shareholder of Westmoreland

Service, LLC d/b/a Go West Mart, Westmoreland was not Midwest’s competitor and did not

suffer any direct injuries from Midwest’s alleged violations of the MFMA. In Points III and IV,

Midwest claims the trial court erred in connection with certain evidentiary rulings regarding (1)

other lawsuits to which Westmoreland and his business had been parties, and (2) some of

Westmoreland’s financial documents including certain tax returns. In Point V, Midwest argues

the trial court erred by denying its motion for remittitur or for a new trial because the verdict was

excessive and unsupported by the evidence. Finally, in Point VI, Midwest argues the trial court’s

 2
attorney’s fees award was excessive. We find in favor of Westmoreland on all six points and

affirm the judgment.

 Background

 In 1967, Westmoreland’s parents opened the Go West Mart filling station on North

Broadway near Interstate 70 in the City of St. Louis. Westmoreland worked at the station during

his youth and into his adulthood and in the late 1990s, Westmoreland took over the station’s

ownership and operation when he became the 90% shareholder of Westmoreland Service, LLC

and of Westmoreland Real Estate, LLC, which owned the land on which the station was located.

Westmoreland’s sister was given the remaining 10% at their mother’s request.

 In 2002, not long after he obtained the controlling interest in the family business,

Westmoreland took out a loan on behalf of the corporation to finance renovations and

improvements to the business. In 2004, Westmoreland took out another loan to add a car wash.

The loans were consolidated, and Westmoreland executed a personal guarantee of the

consolidated loan and granted the bank a deed of trust against his home as security. In 2008, the

bank renewed Westmoreland’s loan which at that time had a balance owed of $1.8 million.

Under the renewal conditions, Westmoreland was required to make 59 payments of

approximately $15,000 per month and, at the end of the renewed loan period on December 30,

2012, $1.3 million would still be owed.

 The other two gas stations involved here, Midwest’s Gas Mart 6 and the non-party

Energy Express (Express), whose gas price war triggered this case, were located on Grand

Avenue near Interstate 70, approximately one mile from Westmoreland’s Go West Mart station.

Before Express opened in 2012, Westmoreland and Midwest had been competing in the gas

retail market for several years. In 2008, Midwest offered Westmoreland $3 million to buy his

 3
station. Westmoreland declined. Then, in March 2012, Express opened its large, modern gas

pumping and retail operation directly across the street from Midwest.

 And at that point, the gas price war of 2012 began. The scene was the Grand Avenue exit

off of busy Interstate 70 where gas customers upon exiting the interstate had two immediate fuel

options – the new Express facility or Midwest’s smaller and more dated station. The jury heard

testimony regarding gas customer behavior patterns including the effect that newer stations like

Express had in initially drawing drivers off the highway but that once off the highway, a

significant number of gas customers, if given a choice between two or more stations, tend to

choose the station with lower prices, even if just slightly lower.

 Trouble started soon after Express opened in March 2012 when Midwest began

repeatedly lowering its gas prices to just under Express’s prices. The skirmish escalated as

Express in turn matched Midwest’s price reductions. The battle continued until both Midwest

and Express were 30 cents per gallon below market price and well below cost. At one point, the

police were summoned to control the line of customers dangerously backing out onto the

interstate.

 Steve Madrass, Express’s owner, testified at length regarding the price war telling the

jury that Midwest was the sole driver of downward prices in that area in 2012. Madrass stated

that the price war ended in November 2012 because he decided to yield to Midwest’s pricing

aggression by allowing Midwest to maintain its gas priced just below Express’s.

 Meanwhile, Westmoreland watched the price war unfold. He told the jury he had

weathered price wars before - in 2007 and 2011 - so between March 7 and November 7, 2012, he

drove by Midwest and Express each day and recorded their prices onto a spreadsheet published

to the jury as Exhibit 15.

 4
 The jury heard testimony on the price war’s impact on Westmoreland’s financial

situation. Westmoreland testified he was financially unable to lower his prices below the market

price. He told the jury that by the end of 2012, his business had lost $150,000 - $160,000 in

profits for the year. He began having difficulty making his monthly loan payments and paying

his fuel supplier, and his loan was scheduled to mature on December 31, 2012 with a balance

owed of $1.3 million.

 Westmoreland told the jury that before the 2012 price war, he had expected the bank to

renew his loan upon its December 2012 maturation just as it had done in 2004 and 2008. The

record showed that the balance on the loan in 2004 and 2008 when the bank renewed the loan

was more than $1.8 million or approximately a half million dollars higher than it was in 2012.

Adding to his optimism was the bank’s decision, after it learned of his end-of-year financial

struggles, to accept smaller loan payments of just $1,250 per week.

 But when the bank became aware in December 2012 that Westmoreland was having

difficulty paying his fuel supplier, and was seeking another supplier to continue operations, the

bank decided not to renew the loan. Instead, on January 14, 2013, the bank foreclosed on

Westmoreland, repossessed the business, and placed it in receivership. One year later, the

receiver sold the station to Midwest, for $1.55 million, approximately half the price Midwest had

offered Westmoreland in 2008. Since the proceeds from that sale did not pay off his entire debt,

the bank obtained a judgment against Westmoreland personally for the remaining balance of

$447,897.19 accruing at 9% interest per annum.

 In addition, Westmoreland told the jury his wages from his truck driving job and all the

income he received from a rental property were being garnished by the bank. The bank also

retained its deed of trust against Westmoreland’s home.

 5
 After the court entered its judgment on the jury verdict, Midwest filed a motion for new

trial and a motion for judgment notwithstanding the verdict or for remittitur. These motions

were based on grounds similar to those raised in this appeal and were denied by the trial court.

This appeal follows.

 Discussion

I. In re Midwest’s Points I and II - Westmoreland had standing to bring this case and

 made a submissible case under the MFMA, § 416.635.

 In its first two points, Midwest asserts that Westmoreland failed to make a submissible

case under the MFMA in that he failed to prove (1) that he was Midwest’s competitor and (2)

that he was directly injured by Midwest’s alleged violations of the MFMA. While couched as an

attack on submissibility, Midwest is essentially claiming that Westmoreland lacks standing or

that he is not the real party in interest. To this end, Midwest makes the facile argument that the

two Westmoreland corporations are the only real parties in interest with standing to bring this

case and that Westmoreland, as an individual and a mere shareholder of those corporations, did

not suffer any direct injury, did not actually sell gas, and was not technically a competitor

because only the Westmoreland corporations occupied those roles.

 We reject Midwest’s assertion that Westmoreland lacked standing to bring this case.

Westmoreland readily satisfies the standing requirement to bring a private action under the

MFMA because he proved he is a “person ... injured in his business or property in the relevant

geographic market.” § 416.635. Though he likely was a competitor, standing in this case is not

limited to competitors. Westmoreland proved his standing because he proved his injury was

“inextricably intertwined” with the injury Midwest sought to inflict on the motor fuel market in

that relevant geographic area. Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982).

 6
 Likewise, we reject Midwest’s assertion that Westmoreland failed to make a submissible

case because we find there was substantial evidence proving each element of the § 416.635

private cause of action.

 1. The standard of review of a denial of a motion for directed verdict tests

 whether the plaintiff made a submissible case.

 We review the denial of a motion for directed verdict to determine whether the plaintiff

made a submissible case. Holley v. Caulfield, 49 S.W.3d 747, 750 (Mo. App. E.D. 2001). A

submissible case requires substantial evidence for every fact essential to liability. Id. In

determining whether a plaintiff has made a submissible case, we review the evidence in the light

most favorable to the jury’s verdict, giving the plaintiff the benefit of all reasonable inferences

and disregarding evidence and inferences that conflict with the verdict. Sanders v. Ahmed, 364

S.W.3d 195, 208 (Mo. banc 2012). We will only reverse the jury’s verdict for insufficient

evidence if there is a complete absence of probative facts to support the jury’s conclusion. Id.

 2. The elements of the private cause of action brought under the MFMA.

 For the elements of the MFMA private cause of action, we look to two sections - §

416.635 and § 416.615. Section 416.635 provides that “[a]ny person who is injured in his

business or property in a relevant geographic market by reason of anything forbidden or declared

unlawful by [the MFMA] may sue therefor in any circuit court of this state . . . .” For the

unlawful conduct element, we look to § 416.615 which deems it unlawful “for any person

engaged in commerce within this state to sell or offer to sell motor fuel below cost ... if: (1) The

intent of the sale or offer is to injure competition; or (2) The intent of the sale or offer is to

induce the purchase of other merchandise, to unfairly divert trade from a competitor, or

otherwise to injure a competitor.”

 7
 So, to make a submissible case under the MFMA, Westmoreland had to prove: (1) that he

was a person injured in his business or property; (2) that his business or property was within the

relevant geographic market; and (3) that his business or property was injured because Midwest

engaged in unlawful activity as proscribed by § 416.615 – specifically that Midwest sold gas

below cost with the intent (i) to injure competition, or (ii) to induce the purchase of other

merchandise, unfairly divert trade from a competitor, or otherwise injure a competitor.

 a. The first element - Person injured in his or her business or property.

 We find that Westmoreland readily satisfies this element. He is a “person” which is

broadly defined in § 416.605(2)(c)(5) as “any individual, firm, partnership, corporation,

association or other entity.” Simple enough. The rest of this element - injured in his business or

property - requires more discussion but Westmoreland ultimately satisfies it as well.

 The MFMA does not define the phrase “injured in his business or property” so we look to

the rules of statutory construction. The primary rule of statutory construction is to ascertain the

intent of the legislature from the language used, to give effect to that intent if possible, and to

consider words used in the statute in their plain and ordinary meaning. Howard v. City of

Kansas City, 332 S.W.3d 772, (Mo. banc 2011). It is apparent that the legislature’s intent in

passing the MFMA was to regulate motor fuel pricing and to prohibit the practice of selling

motor fuel below cost with the intent to damage competition and competitors. § 416.615. As a

remedial statute, the MFMA is construed liberally to include those cases within the spirit of the

law and all reasonable doubts should be construed in favor of its applicability to the case.

Lampley v. Missouri Commission on Human Rights, 570 S.W.3d 16, 23 (Mo. banc 2019).

 To further glean the Missouri legislature’s intent, we look to a closely analogous case

from our nation’s highest court - Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982). In

 8
construing the federal antitrust statute, a close cousin to the one before us, the McCready Court

determined that Congress intended that “person[s]” entitled to bring a private cause of action as a

result of being “injured in his business or property” by the illegal restraint of trade is not limited

“to consumers, or to purchasers, or to competitors, or to sellers” but to anyone who can show that

their injuries were “inextricably intertwined” with the injury the defendants sought to inflict on

the relevant market. 457 U.S. at 484.

 In McCready, the plaintiff filed suit under § 4 of the Clayton Act which granted to “[a]ny

person who shall be injured in his business or property...” the right to bring a private cause of

action for violations of the Sherman Act, which is our nation’s comprehensive antitrust law. Id.

at 468-70. It is no surprise that this language is effectively identical to the language before us

from § 416.635 of the MFMA. The MFMA shares Chapter 416 of RSMo with Missouri’s

antitrust law, § 416.011 - 416.161, which also has this language.3 And Missouri’s antitrust law is

based on the Sherman and Clayton Acts and statutorily tied to them by § 416.141 which

mandates that Missouri’s antitrust law “shall be construed in harmony with ruling judicial

interpretations of comparable federal antitrust statutes.” Which brings us back to McCready

which we find to be one of those “ruling judicial interpretations.” So McCready’s interpretation

of who is a “person injured in his business or property” is highly persuasive and compelling to

our analysis here. See A.H. by and through D’Avis v. Independence School District, 466 S.W.3d

17, 23 (Mo. App. W.D. 2015); Buemi v. Kerckhoff, 359 S.W.3d 16, 23 (Mo. banc 2011).

 Carol McCready was a subscriber or policy holder of a group health plan she obtained

through her employer. 457 U.S. at 465. After Blue Shield denied her reimbursement for

3
 This language is also found in another Chapter 416 law, Missouri’s Unfair Milk Sales Practices
Act, at § 416.455, which allows “[a]ny person who is injured in business or property” to bring a
private action for violations of that Act which prohibits selling milk below cost. § 416.415.
 9
services provided to her by a psychologist, she sued claiming that Blue Shield’s policy of

refusing to reimburse subscribers for services provided by psychologists but allowing

reimbursement for services provided by psychiatrists violated the antitrust laws. Id. at 467. Just

as Midwest argues here, Blue Shield argued that McCready did not have standing to sue under §

4 of the Clayton Act because as a mere subscriber, she was not a “competitor” in the market that

had been allegedly restrained, and therefore, the injury she suffered was not within the sector of

the economy competitively endangered by Blue Shield’s antitrust violations. Id. at 470. The

Court rejected this argument finding that “[t]he statute does not confine its protection to

consumers, or to purchasers, or to competitors, or to sellers . . . . The Act is comprehensive in its

terms and coverage, protecting all who are made victims of the forbidden practices by whomever

they may be perpetrated.” Id. at 472 (citing Mandeville Island Farms, Inc. v. Am. Crystal Sugar

Co., 334 U.S. 219, 236 (1948)). The Court further explained that Congress intended the Act to

be expansive to achieve a remedial purpose: “Congress sought to create a private enforcement

mechanism that would deter violators and deprive them of the fruits of their illegal actions, and

would provide ample compensation to the victims of antitrust violations.” Id.

 While the McCready Court emphasized the broad brush Congress used in describing who

can bring claims for violations of remedial statutes like the antitrust laws, McCready recognized

that the class of persons able to bring such claims cannot be limitless: “Congress did not intend

to allow every person tangentially affected by an antitrust violation to maintain an action to

recover threefold damages for the injury to his business or property.” Id. at 477. So, McCready

established the “inextricably intertwined” test to separate those that may bring such a claim from

those that may not. The Court found that the plaintiff’s injury resulting from Blue Shield’s

illegal policy in restraint of trade of denying reimbursements for psychologist services but

 10
allowing them for psychiatrists, was “inextricably intertwined with the injury the conspirators

sought to inflict on psychologists and the psychotherapy market.” 457 U.S. at 484.

 We find McCready’s holdings regarding the Congress’s intent with respect to the private

cause of action under the federal antitrust laws to be fully applicable here to describe the

Missouri legislature’s intent in passing the MFMA. With the MFMA, the Missouri legislature

created a strong private enforcement mechanism with § 416.635’s grant of the power to bring an

action for damages to “[a]ny person who is injured in his business or property in a relevant

geographic market.” Moreover, the MFMA’s robust provisions mandating that successful

private plaintiffs recover treble their damages plus attorney’s fees and costs serve to “deter

violators, ... deprive them of the fruits of their illegal actions, and ... provide ample compensation

to the victims” of MFMA violations. § 416.635 (quoting McCready, at 472).

 i. Westmoreland’s injuries were “inextricably intertwined” with the injuries

 Midwest sought to inflict on the relevant motor fuel retail market.

 The record here is replete with evidence that Westmoreland’s injuries were “inextricably

intertwined” with the injuries Midwest sought to inflict on its competing gas stations and on the

relevant gas retail market. In fact, we find that Westmoreland’s injuries were even more closely

twined with the damage Midwest sought to inflict on the market than McCready’s. The evidence

was sufficient from which a reasonable jury could conclude that Westmoreland’s business and

property were among Midwest’s targets and that Westmoreland lost everything as a result of

Midwest’s predatory pricing. Westmoreland owned a controlling 90% interest in the business

and the property on which the business stood. He was solely responsible for the management

and operation of the business and although these were Missouri limited liability corporations,

Westmoreland was personally liable for all the debt. This reality was illustrated when the bank

 11
foreclosed and took possession and ownership of the business and property. Then, the bank took

an approximate $500,000 judgment against Westmoreland personally which it continues to

collect by garnishing his wages as a truck driver and his property rental income all while the

bank retains its deed of trust on his home. “Inextricably intertwined” is perhaps an

understatement in this case.

 For its part, Midwest relies on Duvall v. Silvers, Asher, Sher & McLaren M.D.’s, 998

S.W.2d 821 (Mo. App. W.D. 1999), another antitrust case, for its argument that Westmoreland

did not suffer any direct injury sufficient to support this claim. We find Duvall to be readily

distinguishable on its facts from this case and actually undermines Midwest’s position. Relying

on McCready, the court in Duvall rejected the plaintiff’s claim because his alleged injuries failed

McCready’s test in that they were not “inextricably intertwined” with the injury the defendants

allegedly sought to inflict on Duvall’s neurologist Dr. Batchu and the relevant market for

neurology services. 998 S.W.2d at 826-27.

 Seeking $1 million in actual damages and $6 million in punitive damages, Duvall brought

a private cause of action under Missouri’s antitrust law, §§ 416.011 - 416.161, which again, like

the statute here, allows “[a]ny person ... who is injured in his business or property ...” by conduct

violating that law to bring such a suit. § 416.121. Duvall claimed the defendant medical group

acted in restraint of trade when, after terminating its contract with Dr. Batchu, it enforced a non-

compete clause against him preventing him from practicing medicine within a 75-mile radius of

Columbia, Missouri, where Duvall had been seeing him.4 Id. at 823. Duvall asserted that he lost

his claims for Social Security Disability and long-term disability insurance worth over $500,000

because he was unable to “utilize Dr. Batchu.” Id.

4
 The opinion notes that after Dr. Batchu opened an office in Rolla, Missouri, which was beyond the 75 mile limit of
the non-compete clause, Duvall continued treating with him there though he complained about the additional
transportation costs and delays. Id. at 823-4.

 12
 The trial court dismissed Duvall’s petition for failure to state a claim. On appeal, the

Court recognized the mandate in § 416.141 that Missouri’s antitrust statutes be construed “in

harmony with ruling judicial interpretations of comparable federal antitrust statutes.” Id. After

noting that the comparable federal antitrust statute is the Clayton Act, specifically § 4, the Court

then quoted from McCready, supra, that “[t]he statute does not confine its protection to

consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its

terms and coverage, protecting all who are made victims of the forbidden practices by whomever

they may be perpetrated.” 457 U.S. at 472 (quoting Mandeville Island Farms, Inc. v. American

Crystal Sugar Company, 334 U.S. 219, 236 (1948)).

 The Duvall court then noted the caution from McCready that the act is not all-inclusive

but that to determine whether a plaintiff like Duvall has standing to bring a private cause of

action for an antitrust violation, the court “must evaluate the relationship of the harm that Duvall

averred with the defendants’ wrongdoing that he alleged.” Duvall, at 824-5 (citing Associated

Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters, et al, 459 U.S. 519, 535

(1983)). The court then applied McCready’s test and found that unlike McCready’s injury which

was “inextricably intertwined with the injury the conspirators sought to inflict on psychologists

and the psychotherapy market,” Duvall’s supposed injuries were not “inextricably intertwined”

with the injury the defendants allegedly sought to inflict on neurologist Dr. Batchu and the

neurology services market. 998 S.W.2d at 826-27 (quoting McCready, at 484).

 While Duvall helps to illustrate the application of the “inextricably intertwined” rule, it

does not help Midwest here because the relationship between Duvall’s alleged injury and the

supposed antitrust violations claimed by Duvall against the medical group pales in comparison to

 13
that in the case at bar which, in our judgment, is even more inextricably intertwined than even

that of McCready.

 ii. Midwest’s corporate form argument.

 Midwest’s argument - that Westmoreland does not have standing to bring this claim

because only the two Missouri limited liability corporations (LLCs) through which

Westmoreland owned and operated his gas station business and property could be considered

Midwest’s competitors and could claim injury - is based at its core on the corporate form. For

Midwest, only the LLCs did business, sold gas, incurred debt, suffered injury, and could be

considered Midwest’s competitors. This argument has no merit given our analysis above of the

broad standing language of § 416.635 - “any person injured in his business or property” - which

is not limited to competitors.

 Moreover, Midwest’s corporate form argument is belied by the reality in this case that

while Westmoreland’s LLCs may have been theoretically separate, they certainly provided

Westmoreland with little protection as he and his wife personally guaranteed all the debt and

now, after losing their business and property, continue to live under garnishments and in a house

in hock to the bank. In short, our dual holding that (1) Westmoreland has standing and (2) made

a submissible case with respect to the first element of the MFMA private cause of action

disposes of Midwest’s argument that only the LLCs had standing or suffered injury.

 b. The second element - the business or property is located in the “relevant

 geographic market.”

 The MFMA does not define this phrase so we look to our rules of statutory construction,

namely the rule that we “consider words used in the statute in their plain and ordinary meaning.”

Howard, 332 S.W.3d at 779. We find that by including the phrase “relevant geographic market,”

 14
our legislature intended to limit the scope of § 416.635 to those persons whose business or

property is located physically close enough to the situs of the defendant’s illegal gas pricing to be

impacted by that illegal conduct.

 There is substantial evidence in this record that Westmoreland’s Go West Mart gas

station was within the relevant geographic market. It was located approximately 1 mile from

Midwest’s and Express’s stations off the same interstate highway and just one exit away.

Express’s owner, Steve Madrass, testified that Go West Mart was a competitor of Express and

Midwest’s station. And Phil Hurlbut, who operated Go West Mart for the receiver after

Westmoreland was foreclosed on and was Midwest’s first witness at trial, echoed Madrass’s

testimony that Midwest’s and Westmoreland’s stations were competitors.

 The jury also learned that before the price war, Midwest offered to purchase Go West

Mart from Westmoreland and that Midwest ultimately bought the station from the bank’s

receiver for approximately half the price it had offered Westmoreland. Finally, Westmoreland

presented evidence that he lost over $150,000 in revenue during the period of time that

corresponded with the price war Midwest caused. Given our standard of review regarding

submissibility, Sanders, 364 S.W.3d at 208, this evidence readily proves that Westmoreland’s

business or property was within the relevant geographic market.

 c. The third element - the intent of the below-cost sale of gas was (1) to

 injure competition, or (2) to induce the purchase of other merchandise, (3) to

 unfairly divert trade from a competitor, or (4) to otherwise injure a

 competitor.

 i. Midwest sold motor fuel below cost.

 15
 The evidence was largely undisputed that Midwest sold motor fuel below cost as defined

by § 416.605(2).5 Westmoreland told the jury he tracked daily - often twice daily - Midwest’s

and Express’s prices from May 3, 2012 through November 7, 2012 and recorded those prices on

a spreadsheet. See Exhibit 15. He noted on the spreadsheet the dates when Midwest’s price was

less than the cost of the fuel purchased within the three prior days, which satisfied § 416.605(2)’s

definition of selling below cost. Westmoreland told the jury that Midwest sold fuel below cost at

least 61 times during that 189-day period and Westmoreland’s testimony was echoed by Steve

Madrass that Midwest’s below-cost pricing was the sole driver of the price war.

 ii. Midwest had the requisite intent as outlined in § 416.615.

 Selling motor fuel below cost is illegal under § 416.615 when it is done with the intent

(1) to injure competition, or (2) to induce the purchase of other merchandise, (3) to unfairly

divert trade from a competitor, or (4) to otherwise injure a competitor. We note that the verdict

director here submitted the first three clauses in the disjunctive and did not submit under the

fourth clause.

 One is presumed to intend the natural and probable consequences of his or her acts and

conduct. Truck Ins. Exchange v. Pickering, 642 S.W.2d 113, 116 (Mo. App. W.D. 1982). When

an intentional act results in injuries which are the natural and probable consequence of the act,

5
 “(2) ”Cost”, is the sum of:
 (a) a. If the motor fuel is not purchased from an affiliate, the lowest invoice cost that the
seller charged to the purchaser for motor fuel of like grade and quality within three days prior to
the date of any alleged unlawful resale by the purchaser, less trade discounts, allowances or
rebates which the purchaser receives on the particular invoice or transfer; or b. If motor fuel is
purchased or received from an affiliate, the lowest transfer price that the affiliate charged to the
purchaser or receiver for motor fuel of like grade and quality within three days prior to the date
of any alleged unlawful resale by the purchaser or receiver, less trade discounts, allowances, or
rebates which the purchaser receives on the particular invoice or transfer; plus
 (b) The cost of doing business; plus
 (c) Freight charges and all applicable federal, state and local taxes not already included in
 the invoice cost or transfer price;”
 16
the injuries as well as the act are intentional. Id. The intent of the defendant is most often

proved by circumstantial evidence since it is rarely susceptible of proof by direct evidence. State

v. Garner, 800 S.W.2d 785, 788 (Mo. App. E.D. 1990).

 The evidence here of Midwest’s intent is abundant. Midwest repeatedly sold gas below

cost and did so with an eye to competition generally and to its competitors specifically as

contemplated by § 416.615.1. Express’s Steve Madrass was an eyewitness and told the jury the

tale of Midwest’s conduct. He related that Midwest began its aggressive pricing right after

Express opened its new store in March 2012. Madrass explained that Midwest set its prices a

penny below Express’s, forcing Express to match that price,6 and “it just perpetuate[d] down

from there.” Eventually, Madrass decided to stop matching Midwest’s price drop and to just

“give [Midwest] a penny” in order “to stop the bleeding.”

 Westmoreland’s testimony and his Exhibit 15 spreadsheet supported Madrass’s depiction

of the price war. According to Westmoreland, when Express opened, it set its price at $3.59 per

gallon, which was the market price. Westmoreland then tracked and recorded how Midwest

repeatedly lowered its price below Express’s, how Express matched it, and how this pricing

battle continued until both gas stations were 30 cents below the market. Westmoreland kept his

prices at the market rate because he could not afford to lower them. At 30 cents below market

price, cars were backed up onto the highway trying to purchase gas from these facilities.

 We find that Midwest’s conduct unequivocally reflects its intent. Midwest repeatedly

reacted to Express’s price match by again illegally lowering its price below market price over 50

times. Midwest must have known that the natural and probable consequence of its below-market

pricing was that more customers would buy its gas and other merchandise than Express’s and

6
 Under § 416.620.3, it is not a violation of the MFMA to sell below cost “to meet the equally
low price of a competitor.”
 17
than any other gas station in the relevant geographic area including Westmoreland’s. With

Westmoreland located just one highway exit away, we conclude that the natural and probable

consequence of Midwest’s conduct would include Westmoreland making fewer sales of gas and

other merchandise.

 In addition, the jury heard that Midwest unsuccessfully offered Westmoreland $3 million

for his store before the 2012 price war and that Midwest bought it for half that price out of the

receivership. From this evidence, a reasonable jury could conclude that the target of Midwest’s

predatory pricing was not just Express, which as a brand-new station probably appeared to be

able to withstand the attack, but was also Westmoreland. Sanders, 364 S.W.3d at 208.

 iii. Midwest and the trial court misconstrued the holding in State ex rel. Nixon v.

 QuikTrip Corp.

 Before concluding our analysis as to points I and II, we address Midwest’s heavy reliance

on State ex rel. Nixon v. QuikTrip Corp., 133 S.W.3d 33 (Mo. banc 2004) for its arguments that

Westmoreland has no standing and failed to make a submissible case. Nixon is readily

distinguishable because the case before us invokes the MFMA’s private cause of action

provision, § 416.635, while Nixon was brought as an enforcement action by the attorney general

under a separate section of the MFMA.7

 It is true that Nixon turned on the Court’s interpretation of § 416.615, the section that sets

forth the conduct declared unlawful by the MFMA, and proving a violation of this section is part

of the burden of proof in an MFMA claim whether brought by the attorney general under §

416.625 or by a person like Westmoreland under § 416.635. But § 416.615 determines what

7
 § 416.625
 18
constitutes an MFMA violation, not who may bring the action. That power is granted to the

attorney general by § 416.625, and to a private individual by § 416.635.

 But even more fundamentally, Midwest and the trial court have misconstrued the holding

in Nixon8 to be that selling fuel below cost is only illegal under § 416.615 if it actually forces a

competitor to sell below its cost. That is not what the plain language of § 416.615 says and that

was not Nixon’s holding. It bears repeating the four ways that selling below cost may be illegal

under § 416.615.1: If the intent of the sale is (1) to injure competition, (2) to induce the purchase

of other merchandise, (3) to unfairly divert trade from a competitor, or (4) to otherwise injure a

competitor. A fair reading of Nixon shows that it mainly addressed the third and fourth ways.

 Nixon began its discussion by positing the two choices faced by a gas station when a

competitor illegally posts below-cost prices: “to (1) resist lowering its prices because to do so

would threaten its financial viability; or (2) lower its fuel prices to a point that its over-all

financial viability is threatened.” Id. at 38. The Court then tied each of these two choices to one

of the four ways, supra, that the statute may be violated. So, for the Nixon Court, the first option

where the victim resists lowering its prices, means that the below-cost prices were intended to

8
 This misconstruction of Nixon bled into the verdict director with its inclusion of the erroneous
statement purportedly derived from Nixon that being '"injured in his business or property' means
being forced to sell below cost." Again, such a statement is not supported by Nixon and is not
found there since Nixon did not consider the § 416.635 private cause of action where the phrase
"injured in his business or property" is found. See Martin v. Fulton Iron Works Co., 640 S.W.2d
491, 495 (Mo. App. E.D. 1982) (“[A] respondent may attack the erroneous rulings of the trial
court for the purpose of sustaining a judgment in its favor.”). Furthermore, this misstatement in
the verdict director is irrelevant to submissibility which is the basis of Midwest's point of error,
not instructional error. Wieland v. Owner-Operator Services, Inc., 540 S.W.3d 845, 858 n.4
(Mo. banc 2018). Finally, Midwest has not demonstrated any prejudice here because it proffered
the verdict director and continues to claim on this appeal that it is correct. Burns v. Elk River
Ambulance, Inc., 55 S.W.3d 466, 476 (Mo. App. S.D. 2001) (“[T]he giving of an alleged
erroneous instruction is not grounds for reversal unless the appealing party was prejudiced
thereby.”); see also, Lay v. P & G Health Care, Inc., 37 S.W.3d 310, 329-30 (Mo. App. W.D.
2000).

 19
“unfairly divert trade from” a competitor. This directly quotes the third way that below-cost fuel

sales may be found illegal under the MFMA.

 Then, with respect to the second choice where the victim lowers its prices to match the

illegal prices, the Nixon Court tied this scenario to the fourth way to violate the MFMA

("otherwise to injure a competitor") when it noted that the “second option is to lower its prices

below its costs and thereby suffer an injury.” Id.

 We observe that identifying each of these two choices as the exclusive means by which

the third and fourth ways the MFMA may be violated is not found in the statute expressly nor by

implication but Nixon seems to suggest this to be the case. Nevertheless, Nixon does not hold

that the only way that a violation of the MFMA can be found is if a victim-competitor actually

lowers its own prices below cost. The following demonstrates this.

 After noting that the record did not disclose “whether QuikTrip’s actions unfairly

diverted trade from its competitors because the competitors were unable to lower prices to

compete with QuikTrip’s pricing,” the Court instructed that “t]his is a question that can be

explored on remand.” Id. It would be unnecessary to direct the trial court on remand to address

the question whether QuikTrip had unfairly diverted trade from its competitors who were unable

to lower prices if that question was not part of the analysis of whether QuikTrip’s actions

violated § 416.615. That question is certainly part of the analysis because the legislature put it in

§ 416.615.1 and Nixon sent the case back to the trial court to determine whether that species of

MFMA violation had occurred. This unmistakable conclusion demonstrates that Nixon did not

hold that the only instance when below-cost fuel sales are illegal under the statute is when they

have forced a competitor to lower its price.

 20
 Nixon then turned its attention to “[t]he other theory” that it invited the trial court to

“explore on remand,” namely the fourth way - whether the “intent of the sale is to ... injure a

competitor.” The Court then exhaustively examined the meaning of “injure” in this context and

concluded that it means that the competitor has been forced to sell below its cost. Id. at 38. But

again, Nixon did not hold that the only way to find a violation of the § 416.615.1 is to adduce

evidence that the illegal below-cost sale was intended and actually caused a competitor to sell

below its cost. Rather, Nixon's partial holding in this regard was in the context only of the fourth

way the statute could be violated.

 A competitor being injured by being forced to lower its gas prices and a competitor

having trade unfairly diverted away because it resisted lowering its prices, are not mutually

exclusive concepts. For Nixon, both “threaten ... financial viability” and both are listed as

potential violations under § 416.615.1.

 In addition to misconstruing the holding in Nixon, Midwest also conflates Nixon’s

treatment of the MFMA provision establishing what is the illegal conduct with the separate

provision that determines who can bring a private cause of action for such illegal conduct. That

is covered in § 416.635 and exhaustively above. This understandable confusion stems from the

use of the term “competitor” in § 416.615.1(2) to define what constitutes unlawful below-cost

fuel sales because an injured competitor would also likely have standing to bring a § 416.635

private cause of action. But the legislature did not so limit the class of viable plaintiffs in such

an action. If the legislature had wanted to limit who could bring a private cause of action under

the MFMA to competitors only, it could have easily done so.

 So, whether the intent of the sale was to injure competition, to induce the purchase of

other merchandise, to unfairly divert trade from a competitor, or otherwise to injure a competitor

 21
are all questions designed to determine whether one or more violations have occurred, not who

may bring a claim. That question is answered in § 416.635’s plain language - any person who is

injured in his business or property in a relevant geographic market - language not limited “ to

consumers, or to purchasers, or to competitors, or to sellers.” McCready, 457 U.S. at 472.

 Finally, Nixon does help us to show that violations of § 416.615 occurred here. In fact,

the jury heard evidence touching on the two choices posited by Nixon that a gas station faces

when a competitor illegally posts below-cost prices. Westmoreland chose the first option

because he was unable to lower his prices and suffered over $150,000 in lost revenue. Express

chose the second option by matching Midwest's below-cost pricing and was injured by being

forced to repeatedly sell below its cost. Both scenarios represent violations of § 416.615 and it is

irrelevant that Express is not a party-plaintiff here or otherwise did not sue Midwest because

again these questions are about whether Midwest violated the MFMA, not who can sue.

 3. Conclusion to Points I & II.

 Therefore, we find that Westmoreland satisfies the broad language of § 416.635 in terms

of who can bring a private MFMA claim because he readily satisfies the language of § 416.635

and he proved that the “injury to his business or property” was “inextricably intertwined” with

the injury Midwest sought to inflict on the relevant motor fuel market. We also conclude that

there was substantial evidence supporting each element of Westmoreland’s cause of action under

§ 416.635 and that he therefore made a submissible case.

III. Point Three - Midwest’s effort to present evidence of prior lawsuits involving

 Westmoreland and his business.

 Midwest’s point of error that the trial court wrongfully excluded from evidence several

lawsuits to which Westmoreland was a party is based on an inaccurate premise. The trial court

 22
never excluded the evidence in question. Rather, the court repeatedly insisted that Midwest lay a

proper foundation for such evidence before it would be permitted to pursue its admission or use

it to cross-examine Westmoreland. Yet, Midwest repeatedly failed to comply with the court’s

admonitions and, in the judgment and discretion of the trial court, failed to lay the proper

foundation. Then, critically for our purposes, Midwest failed to make any offer of proof.

 After the jury was selected, but before opening statements, the trial court took up as a

preliminary matter Westmoreland’s issue with Midwest’s exhibit list which listed a number of

pleadings from other lawsuits in which Westmoreland was a party. Midwest told the court that

they were “pleadings from federal cases ... claiming the exact same thing that the plaintiff claims

today except against other parties.” Midwest claims that in those lawsuits Westmoreland made

several admissions that contradicted his allegations here and that he attributed the cause of his

financial problems to the conduct of those other entities.

 These suits included Westmoreland’s unsuccessful 2011 effort to block construction of a

Love’s gas station directly across from Westmoreland’s. Love’s began operations after

Westmoreland had already lost his business. Another case involved the litigation against

QuikTrip regarding allegations that QuikTrip had engaged in predatory pricing in 2011. Finally,

Midwest’s exhibit list included a 2012 lawsuit against Westmoreland’s gas supplier claiming it

was overcharging him.

 Since this was the first time the trial court had learned of Midwest’s intention to seek the

admission of these matters, the trial court instructed Midwest’s counsel not to reference the

lawsuits during opening statement, but that if counsel intended to seek their admission that she

would have to lay an adequate foundation for their relevance: “You are free to lay what, if any,

 23
foundation you are able to show that they are relevant and admissible since that hasn’t been

done.”

 Then on several occasions during trial, Midwest’s efforts to introduce during cross-

examination of Westmoreland one or more of the lawsuits were met with objections from

Westmoreland and the trial court’s insistence that Midwest lay an adequate foundation. The

first involved Westmoreland’s motion to enjoin the construction of the Love’s gas station across

the street and the second his suit against QuikTrip. The trial court’s position was laid bare in the

following episode on the second day of trial: When counsel asked Westmoreland if he sued

QuikTrip concerning a prior price war, the trial court sustained the relevance objection but then

immediately excused the jury and admonished Midwest’s counsel as follows:

 “[T]he Court made clear yesterday you were not to go into the lawsuits. And if you

 intended to, you were to approach the bench first. And so in direct contradiction to what

 I told you yesterday, you’ve now purposefully raised two of them in front of the jury

 without asking to approach to lay any foundation as to how they are relevant. So I would

 caution you from continuing to directly violate what the Court told you.”

 Yet, at this point and after each of the numerous times the trial court cautioned Midwest

that it had not laid an adequate foundation for the lawsuit evidence, Midwest failed to do so and,

importantly, also failed to make an offer of proof.

 1. Midwest waived appellate review of these matters by failing to make any

 offer of proof.

 We generally do not review a point challenging a trial court’s ruling on evidentiary

matters unless the proponent of the evidence preserved the point by making a specific and

definite offer of proof before the trial court. Frank v. Envtl. Sanitation Mgmt., Inc., 687 S.W.2d

 24
876, 883–84 (Mo. banc 1985). Such an offer of proof must include: “(1) what the proffered

evidence would be; (2) its object and purpose; and (3) all the facts necessary to establish its

relevance and admissibility.” Menschik v. Heartland Reg’l Med. Ctr., 531 S.W.3d 551, 562

(Mo. App. W.D. 2017) (internal quotation omitted). “To preserve the matter for appellate

review, the offer of proof must be made during trial,” and “[a]n offer of proof made before trial

at a hearing on a motion in limine will not suffice.” State v. Marshall, 131 S.W.3d 375, 377

(Mo. App. E.D. 2004).

 “The purpose of making such an offer is to inform the trial court about the content of the

proffered evidence and to allow an appellate court to assess the prejudicial effect of the

exclusion.” Id. (internal quotation omitted). Failure to make an offer of proof preserves nothing

for review and requires us to dismiss the point. Eckelkamp v. Eckelkamp, 609 S.W.3d 499, 505

(Mo. App. E.D. 2020); Payne v. Fiesta Corp., 543 S.W.3d 109, 123 (Mo. App. E.D. 2018);

Menschik, 531 S.W.3d at 562 (internal citation omitted). “[A]n ... offer of proof must

be made so the trial court has the opportunity to consider such circumstances and developments

and thus be enabled to make a reasoned and fully advised decision. Evans v. Wal-Mart Stores,

Inc., 976 S.W.2d 582, 584 (Mo. App. E.D. 1998) (quoting Robbins v. Jewish Hosp. of St. Louis,

663 S.W.2d 341, 348 (Mo. App. E.D. 1983)).

 Midwest failed to adhere to any of these foregoing principles. Simply asserting that these

are lawsuits in which Westmoreland claimed “the exact same thing” against other parties is

insufficient.

 However, Midwest’s brief provides extensive discussion regarding these lawsuits

including references to the case files in the online federal docketing system, certain details of the

facts of those cases, and some of the allegations made by Westmoreland against those entities.

 25
But these materials are not properly before us because they were not before the trial court. Rule

84.13(e). As the Supreme Court stated in Shepard v. Shepard, 186 S.W.2d 472, 477 (Mo. 1945),

“the record of the case as made in the trial court is not a loose-leaf ledger ... but the record

constitutes a closed book binding on the parties to the suit.” Id. Such is the case here.

 And in Jones v. Keller, 850 S.W.2d 383, 384 (Mo. App. E.D. 1993), after the appellant

attempted to supplement the trial court record with deposition testimony and an exhibit that were

not before the trial court, this Court noted that “[s]uch tactics are improper, unfair to opposing

counsel and burdensome to this Court. To the extent that Plaintiffs seek to assign error to the

trial court on the basis of such materials, the allegations have not been properly preserved for

review and will not be considered herein. Rule 84.13(a).” Id.

 While Midwest’s improper inclusion of the pleadings and details from these lawsuits that

were not part of the record at trial is objectionable, it is also helpful because it illustrates the

offer-of-proof record Midwest should have made at trial to preserve these issues for appeal, but

did not.

 2. The trial court’s insistence that an adequate foundation be laid for the

 evidence of Westmoreland’s prior lawsuits was not an abuse of discretion.

 Whether a sufficient foundation has been laid for the admission of evidence is within the

sound discretion of the trial court. Healthcare Services of the Ozarks, Inc. v. Copeland, 198

S.W.3d 604, 616 (Mo. banc 2006). Even if these issues had been preserved, we would not be

persuaded that the trial court abused its discretion in its repeated insistence that Midwest lay an

adequate foundation for the relevance and admissibility of these lawsuits. See Ullrich v.

CADCO, Inc., 244 S.W.3d 772, 781 (Mo. App. E.D. 2008).

 26
 3. No prejudice.

 The admission of evidence is reviewed for prejudice, not mere error. Teasdale & Assoc.

v. Richmond Heights Church of God in Christ, 373 S.W.3d 17, 24 (Mo. App. E.D. 2012). “Even

if the circuit court abuses its discretion in excluding the evidence, we should not reverse the

circuit court’s judgment unless the abuse had a material effect on the trial.” Stokes v. Nat’l

Presto Indus., Inc., 168 S.W.3d 481, 483 (Mo. App. W.D. 2005).

 Midwest has failed to satisfy its burden in this regard because there was ample evidence

before the jury that Westmoreland had brought several lawsuits against other motor fuel retailers

claiming he was being financially damaged by their conduct. In addition, the jury was fully

aware of other financial pressures on Westmoreland unrelated to Midwest’s conduct.

IV. Point Four - Midwest’s effort to employ certain financial documents including three

 years of Westmoreland’s tax returns.

 In Point Four, Midwest argues he is entitled to a new trial because the trial court erred in

connection with its rulings regarding Midwest’s use during cross-examination of certain

financial documents in that this evidence would have shown that Westmoreland’s financial

difficulties pre-existed Midwest’s alleged violations of the MFMA. These claims are similar to

those of Point Three and our disposition is the same.

 1. Westmoreland’s business tax returns.

 The first issue concerns Westmoreland’s 2009, 2010, and 2011 business tax returns.

Midwest sought to cross-examine Westmoreland with those tax returns to show that

Westmoreland had failed to reserve enough money to pay off the $1.3 million balance on his

loan to the bank upon its December 2012 maturation and that that was the reason he lost his

business, not Midwest’s actions. Midwest began its cross-examination with the 2009 return

 27
which the trial court admitted into evidence. However, when Midwest asked Westmoreland to

admit that the amount appearing on the “retained earnings” line at page 4 line 24 of the tax form

was the same as the amount of reserves that he had kept in his bank account in order to be able to

pay the balance due on the loan upon its maturation, Westmoreland’s counsel objected that the

question called for expert testimony. Though Westmoreland answered that that was not what he

understood the phrase “retained earnings” on a tax return to mean, the trial court sustained the

objection and explained its ruling: “Well, obviously a CPA filled this out and now you’re asking

a layperson questions about it. So either lay a foundation or move on with a different witness.”

 But as it did throughout the trial, Midwest made no effort to lay a foundation. Midwest

failed to establish either through Westmoreland or another witness what the phrase “retained

earnings” in a business’s tax return means nor whether it means what Midwest’s counsel

asserted. Instead, Midwest moved on to cross-examine Westmoreland in a similar way about the

tax returns for 2010 and 2011, which the trial court also denied based on its previous ruling.

 We not only find the trial court’s lack-of-foundation ruling was not an abuse of

discretion, Cummins v. Cummins, 873 S.W.2d 280, 282 (Mo. App. W.D. 1994), but Midwest

failed to preserve the issue for appeal because it failed to make an offer of proof to address the

foundational deficiencies raised by the trial court. See Brown, 604 S.W.2d at 16.

 Moreover, Midwest has again failed to demonstrate prejudice. The jury was fully aware

that Westmoreland lacked the money to pay off the loan upon its maturation. But the jury also

heard Westmoreland’s testimony that on two previous occasions the bank had renewed the loan

upon its maturation in 2004 and 2008 when the balances were approximately $1.8 million. And

by “reserves,” Westmoreland testified he meant the funds he used to operate his business and pay

his bills including the loan payment and that due to the over $150,000 he told the jury he lost

 28
because of the 2012 price war, he would have been able to continue to operate and service his

debt. The jury apparently and reasonably chose to believe that but for Midwest’s conduct,

Westmoreland would have continued to generate income sufficient to continue to make his loan

payments and that the bank would likely have renewed the loan again and continued its decade-

long relationship with Westmoreland.

 2. Sales tax liens.

 Midwest next claims9 the trial court erred in sustaining the relevancy objection to two

2010 sales tax liens totaling $15,000. Midwest failed to demonstrate the trial court abused its

discretion in this regard particularly since Midwest was allowed to use the documents to refresh

Westmoreland’s recollection and Westmoreland admitted to the existence of these unpaid debts.

 3. Exhibit FF - certain profit and loss statements generated by the company

 hired by the receiver to run the business.

 Midwest sought to cross-examine Westmoreland with a profit and loss document

generated by the company managing Westmoreland’s former business while it was in

receivership in an apparent effort to establish that the business was run at a profit after

Westmoreland left. During this portion of cross-examination, Westmoreland admitted that he

had received certain profit and loss statements from the receiver but had not received all of them

during the time the business was under receivership. Midwest asked Westmoreland whether the

business while in receivership had made a profit or not. After Westmoreland testified that, based

on the financial documents he saw, the business did not make a profit, Midwest presented

Exhibit FF which he identified as profit and loss statements that the receiver submitted to the

9
 Midwest’s fourth point violates Rule 84.04(d)’s prohibition on multifarious points but we will
exercise our discretion to review the multiple claims of error raised in this point. AB Realty One,
LLC v. Miken Techs., Inc., 466 S.W.3d 722, 729 n.4 (Mo. App. E.D. 2015).
 29
bank at the end of the receivership. After Westmoreland objected, the court again questioned the

foundation since these were not Westmoreland’s documents and Midwest had failed to

demonstrate that Westmoreland was familiar enough with the receiver’s operation of the

business so as to be able to testify to these internal financial documents of a business he no

longer owned. Yet again, Midwest made no effort to establish such a foundation. Midwest then

failed again to make an offer of proof and without an offer of proof, there is nothing to review.

See Brown, 604 S.W.2d at 16.

 But Midwest had the opportunity to establish an adequate foundation for Exhibit FF

during the testimony of Phil Hurlbut, who worked for the management company the receiver

hired to run the business, but it failed to question Hurlbut regarding Exhibit FF at all. And on

the prejudice front, Midwest fails there as well because Hurlbut testified that indeed the business

operated at a profit during the receivership and that his review of some of Westmoreland’s

records showed some expenses that seemed odd and unusually high. So, Midwest got before the

jury what seemed to be its purpose with the profit and loss exhibit - that the business operated at

a profit after Westmoreland left.

 4. Exhibit T - Westmoreland’s motion to enjoin the sale of his former business

 out of the receivership.

 Midwest also attempted to impeach Westmoreland using a pleading filed on his behalf to

try to stop the sale of his former business. The court allowed Midwest to cross-examine

Westmoreland with Exhibit T and Westmoreland readily admitted that he had in fact tried to stop

the sale because he did not believe the price was sufficient and because any deficiency would be

his responsibility based on his personal guarantee. Nevertheless, the court declined to admit the

 30
document itself because Midwest had again failed to lay an adequate foundation as to its

relevance. We agree.

 Midwest has simply failed to demonstrate how a pleading in a separate case in which

Westmoreland sought to stop the sale of his former business was relevant to the issues in this

case. In its brief, Midwest makes the dubious claim that this document would have shown that

Westmoreland’s business’s financial problems were not caused by Midwest. And Midwest also

fails to show how the court’s lack-of-foundation ruling was an abuse of discretion or how

Midwest was prejudiced since Westmoreland admitted that he indeed tried to stop the sale.

Watson v. City of St. Peters, 599 S.W.3d 479, 487 (Mo. App. E.D. 2020). Point Four is denied.

V. The denial of Midwest’s alternative motion for remittitur or new trial was not error

 because the verdict was not excessive or unsupported by the evidence.

 The remittitur statute, § 537.068, permits the trial court to reduce the damages awarded to

a plaintiff if “after reviewing the evidence in support of the jury’s verdict, the court finds that the

jury’s verdict is excessive because the amount of the verdict exceeds fair and reasonable

compensation for plaintiff’s injuries and damages.” See also, Rule 78.10. To warrant remittitur

or a new trial in this context, the size of the verdict must be so grossly excessive as to shock the

conscience because it is glaringly unwarranted. Soto v. Costco Wholesale Corp., 502 S.W.3d 38,

54 (Mo. App. W.D. 2016). When a request for remittitur is presented to the trial court and

overruled, we view the evidence in the light most favorable to the trial court’s ruling, Badahman

v. Catering St. Louis, 395 S.W.2d 29, 39-40 (Mo. banc 2013), and we reverse only if an abuse of

discretion is shown. Jarrell v. Fort Worth Steel & Mfg. Co., 666 S.W.2d 828, 839 (Mo. App.

E.D. 1984).

 31
 Viewed in this light, we find no abuse of discretion in the trial court’s determination that

the verdict was not excessive and therefore did not warrant remittitur or a new trial. The

evidence before the jury established that Midwest’s predatory pricing in violation of the MFMA

caused Westmoreland to suffer substantial losses to his business and property. A business that

had just a few years before drawn a $3 million offer from Midwest itself and was later sold for

approximately $1.5 million out of the receivership gave the jury ample foundation to reach a

valuation of the business that Westmoreland lost. In addition, the jury had before it the

approximately $500,000 judgment the bank obtained after the foreclosure against Westmoreland

and his wife on their personal guarantees of the business’s debts.

 Based on the foregoing, Midwest fails to demonstrate that the $1.8 million verdict was so

grossly excessive as to shock the conscience. As such, the court did not abuse its discretion by

denying Midwest’s motion for remittitur or alternative motion for new trial. Point V is denied.

VI. The attorney’s fees award was not excessive

 In its sixth and final point on appeal, Midwest argues the trial court’s award of $200,000

in attorney’s fees to Westmoreland was excessive. We disagree. Section 416.635(1) mandates

in a private cause of action brought under § 416.635 that “if the judgment is for the plaintiff,

such person shall be awarded ... reasonable attorney’s fees as determined by the court, ...”

(Emphasis added.) Trial courts in Missouri are considered experts with regard to the award of

attorney’s fees and have discretion when doing so. Howard v. City of Kansas City, 332 S.W.3d

772, 792 (Mo. banc 2011). To show an abuse of discretion, the complaining party must

demonstrate the trial court’s decision was against the logic of the circumstances and so arbitrary

and unreasonable as to shock one’s sense of justice. Id.

 32
 Based on our review of the trial court’s well-reasoned and detailed treatment of the

attorney’s fees request in its order and judgment, we find no abuse of discretion. As required,

the court began its evaluation by first determining the “lodestar” by multiplying the number of

hours reasonably expended by a reasonable hourly rate. Selleck v. Keith M. Evans Insurance,

Inc., 535 S.W.3d 779, 784-5 (Mo. App. E.D. 2017). The trial court’s lodestar amount of

$66,000 was based on Westmoreland’s counsel’s representation that he worked approximately

165 hours on the case at an hourly rate of $400 which the court found to be reasonable.

 The trial court then looked to certain factors which the Missouri Supreme Court in Berry

v. Volkswagen Grp. of Am., Inc., 397 S.W.3d 425, 431 (Mo. banc 2013) suggested that trial

courts may consider in the exercise of their broad discretion to award reasonable attorney’s fees

including: 1) the rates customarily charged by the attorneys involved in the case and by other

attorneys in the community for similar services; 2) the number of hours reasonably expended on

the litigation; 3) the nature and character of the services rendered; 4) the degree of professional

ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the

result obtained; and 7) the vigor of the opposition. Id.

 Then, the court determined that a lodestar multiplier of approximately 3 was appropriate

based on the court’s findings that this was a unique and complicated case, a case of first

impression that few lawyers would have agreed to pursue on a contingent-fee basis, and a case

that was vigorously defended. And application of the multiplier to the lodestar resulted in the

$200,000 attorney’s fees award.

 Midwest argues that the trial court erred because it considered some of the same factors

in determining both the lodestar amount and the multiplier. While we agree with the Berry

Court’s caution that in determining whether to apply a multiplier to the lodestar, the trial court

 33
“should avoid awarding a multiplier based upon facts that it considered in its initial

determination of the lodestar amount,” we do not find that the trial court did so here. 397

S.W.3d at 432. We find that only after the trial court arrived at the lodestar amount did it

proceed to consider some of the additional factors the Berry Court invited it to consider in its

discretion to arrive at a final attorney’s fee award. In its judgment, some of those additional

factors were specifically tied to the trial court’s consideration of whether to apply a multiplier

and at what amount. Specifically, the court held:

 “Plaintiff presented evidence that this was a unique case, one that not many attorneys

 would take on a contingent-fee basis. The case was vigorously defended and Plaintiff

 ultimately prevailed. The Court finds that a multiplier of approximately three times the

 lodestar amount is appropriate.”

 Accordingly, we find no abuse of discretion in the trial court lodestar amount, its

application of a multiplier, and its ultimate attorney’s fee award of $200,000. Therefore the trial

court’s attorney’s fee and costs award is affirmed.

 Westmoreland also seeks pursuant to our Local Rule 400 attorney’s fees incurred in

connection with this appeal. Since the entitlement to attorney’s fees on appeal stands upon the

same ground as at the trial court, Merseal v. Farm Bureau Town & Country Ins. Co. of Mo., 396

S.W.3d 467, 475 (Mo. App. E.D. 2013), we find that Westmoreland is entitled to reasonable

attorney’s fees on appeal pursuant to § 416.635(1).

 As far as the amount of the attorney’s fee award, we have the authority to determine the

reasonableness of the requested fee. Frontenac Bank v. GB Investments, LLC, 528 S.W.3d 381,

397 (Mo. App. E.D. 2017). Here, Westmoreland’s $61,800 request is based on a lower hourly

rate - $250 per hour - than the rate the trial court found to be reasonable under § 416.635(1) and

 34
which we have already affirmed in this opinion. Accordingly, we find Westmoreland’s request

to be reasonable, so we therefore grant his motion for attorney’s fees in the amount of $61,800.

 Conclusion

 For the reasons set forth above, we affirm the judgment of the trial court. In addition,

Westmoreland’s motion for attorney’s fees on appeal is granted in the amount of $61,800.

 ________________________
 James M. Dowd, Judge

Angela T. Quigless, P.J., and
Kurt S. Odenwald, J., concur.

 35